

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## NO. PD-1311-08

---

**BRUNSHAE STEADMAN, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### CORYELL COUNTY

---

KELLER, P.J., delivered the opinion of the Court in which MEYERS, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. JOHNSON, J., concurred. PRICE and WOMACK, JJ., dissented.

The court of appeals in this case determined that the evidence was factually insufficient to support one of appellant's aggravated sexual assault convictions. We find that the review conducted by the court of appeals failed to conform to the requirements of *Clewis v. State*[1] and its progeny. We reverse the judgment of the court of appeals and remand the case for further consideration.

---

[1]  922 S.W.2d 126 (Tex. Crim. App. 1996).

## I. BACKGROUND

Appellant was convicted of two aggravated sexual assault offenses. One of the convictions was for penetrating the complainant's sexual organ with his finger; the other conviction was for penetrating the complainant's sexual organ with his sexual organ.[2] The court of appeals affirmed the conviction for the former offense, but it reversed the latter conviction for factual insufficiency.[3] We set out verbatim the factual background recited by the court of appeals, but we italicize portions of the recitation that, for reasons that will be given later, appear to be problematic:

> Steadman was the boyfriend of L.N.'s mother, Edwina. He often babysat L.N. and her two brothers when Edwina was out of the home. L.N. made an outcry of sexual abuse against Steadman to her grandmother, Mary. L.N. was four years old at this time.
>
> Mary discovered a "green and slimy" discharge in L.N.'s underwear and asked L.N. whether Steadman had touched her. L.N. stated that Steadman "laid down on top of me and played with me," touched her "tutu," meaning her vaginal area, and touched her with his penis "[d]own in her stride," also meaning her vaginal area. *She did not accuse Steadman of penetrating her with either his finger or his penis.* L.N. had previously accused another man of "put[ting] his finger in her middle spot with her clothes on" and touching her without her clothes on, but the police were unable to locate the man. However, neither Edwina nor Mary had previously observed L.N. experience green discharge. Mary did recall a previous incident where L.N. complained of her "tutu" hurting and bleeding.
>
> Edwina took L.N. to the emergency room where she was examined by Annette Wendeborn and Dr. Barry Phillips. She told Wendeborn and Phillips that L.N. had a "greenish discharge," itching, and redness. According to Wendeborn, these symptoms indicate a sexually transmitted disease and it is uncommon to see that type of discharge in a child L.N.'s age. Some sexual contact had to be involved. Dr. Phillips testified that L.N.'s exam revealed a green watery discharge, "mild reddish irritation," and no "evidence of trauma." He does not "routinely" see discharge from

---

[2] He was sentenced to twenty years on each offense, to run concurrently.

[3] *Steadman v. State*, 262 S.W.3d 401 (Tex. App.–Waco 2008). Though resolved in a single opinion, the two convictions have separate cause numbers in the court of appeals. We granted review only of the cause involving penetration of the victim's sexual organ.

a child who has never had a menstrual cycle or sexual intercourse. Other than a sexually transmitted disease, L.N. could have had any number of bacterial infections and the irritation could have been caused by using the restroom, bathing, or scratching. Wendeborn and Phillips took a culture to determine the type of infection involved.

Dr. Arundhati Rao's lab tested L.N.'s specimen, which tested positive for gonorrhea. The test was performed twice. Dr. Darren Hamm, L.N.'s primary care physician, gave L.N. an injection to treat the infection. Although he did not make his own diagnosis of gonorrhea, he testified that the infection in a child indicates "sexual trauma, sexual abuse." Deborah Kleypas, sexual assault nurse examiner, and Dr. Pamela Greene subsequently performed a sexual assault examination of L.N., during which L.N. had to be sedated. During the exam, Kleypas and Greene observed V-shaped notches in L.N.'s hymen and posterior fourchette. According to Kleypas, these findings are not "definitive proof of sexual abuse," but could have resulted from abuse and were consistent with the abuse that L.N. described. The notches were the only signs of penetration. Pointing to specific parts on a body diagram, L.N. told Kleypas that Steadman put his penis on her bottom and on her "tutu."

Deputy Armando Paniagua spoke with Steadman who denied either having gonorrhea or infecting L.N. with gonorrhea. Steadman consented, in writing, to be tested for gonorrhea. Kleypas examined Steadman and obtained specimens for testing. She also obtained a specimen from the husband of a woman who had babysat L.N. Steadman told Edwina that he had taken a test for gonorrhea. Edwina testified that Steadman asked what would happen if he tested positive, seemed "scared," and did not want to go to jail for something he did not do. He apologized to Edwina for whatever he had done. Edwina found this apology unusual, as Steadman had never apologized in a similar manner.

Dr. Rao's lab tested Steadman's urine specimen and urethral swab, both of which tested positive for gonorrhea. Like L.N.'s test, Steadman's test was also repeated. The other man's specimen tested negative. Dr. Rao testified that there was no way the samples could have been switched.

Paniagua told Steadman that the test was negative and Steadman agreed to come to the Sheriff's office to discuss it. Before taking Steadman's written statement, Paniagua informed Steadman that he actually tested positive. Steadman appeared upset and surprised, began crying, and denied having an infection. He told Paniagua that he touched L.N. by rubbing her sexual organ with his finger and penetrated her with his finger under her clothing. In his statement, Steadman wrote, "I was playing with my self and got cum on my finger, I was drunk at the time I touch [L.N.] with my hand, I never did do anything other than that." Steadman used gestures to show Paniagua what he did to L.N. After writing his statement, Steadman denied doing

anything to L.N. and stopped the interview.

Edwina was unaware that Steadman had gonorrhea and told Paniagua that she did not believe Steadman had gonorrhea. Even after discovering that Steadman was infected, she was surprised and did not believe it because she had never observed any symptoms. Edwina previously had gonorrhea when pregnant with L.N. Greene testified that a baby could contract gonorrhea during child birth, but the infection would develop in the child's eyes.

Kleypas testified that any object that passes the labia majora constitutes "penetrating the female sexual organ" and does not "necessarily have to go in the vagina to be penetration." She further testified that "full penetration" by the male sexual organ is difficult in a child L.N.'s age. There was no evidence of "full penetration" in L.N.'s case. It is common not to find any injuries to the female sexual organ as a result of sexual assault. *She explained that gonorrhea is normally transmitted via genital to genital contact, but penetration is not necessary.* She could not definitively state that L.N. was sexually abused and, other than the lab results, her examination of Steadman did not reveal that he had gonorrhea.

*Dr. Greene testified that gonorrhea can be found on the vagina even if the male sexual organ rubs on the outside of the vagina. Gonorrhea can be transmitted by the male sexual organ touching a child's sexual organ. Greene was not one hundred percent certain that gonorrhea could be transmitted by touching a finger with semen on it to the child's sexual organ*; *it would have to be a "large inoculum" and be quickly placed on the child's sexual organ. A child is more susceptible to infection*; adults may not have symptoms, but a child usually will. It is abnormal for a four-year-old child to have a discharge; thus, *if gonorrhea is detected, the child has been sexually abused*. A normal exam is common because a child's vaginal opening is too small for full penile penetration.

Dr. Robert Fader testified that adults can have gonorrhea without showing any symptoms. It is unlikely that children will not exhibit symptoms. *Gonorrhea could be transmitted where a male has semen on his finger and then touches the female sexual organ or rubs the outside of the vagina. Gonorrhea is not always the result of sexual assault. Steadman's and L.N.'s specimens were sent to the Center for Disease Control for testing that could potentially link the two cases of gonorrhea. However, the CDC never received L.N.'s specimen. Had the test been performed it would have been definitive.* Even had L.N.'s sample been received, the CDC had indicated that it might not be able to extract enough DNA to properly perform the test.

Edwina testified that L.N. struggles to discuss the offense, often changing the subject, providing excuses, or expressing fear. According to Mary, L.N. is now moody and

sometimes reacts in anger. L.N.'s counselor testified that L.N. exhibits signs of "agitation" and "avoidance" when discussing the offense.[4]

In finding the evidence to be *legally* sufficient to show penetration by the appellant's sexual organ, the court of appeals observed that the complainant made various statements showing his sexual contact with her: that appellant had touched her with his penis "[d]own in her stride," that he had "laid down on top" of her and "played with" her, and that he had put his penis on her "tutu."[5] The court of appeals also pointed to the fact that the complainant "suffered from a green discharge, irritation, and injuries to her hymen and posterior forchette."[6] Further, the court explained that the complainant and appellant both tested positive for gonorrhea, "which can be transmitted through penile penetration."[7] The court concluded: "Because L.N.'s account need not be precise, the jury could find penetration by sexual organ even though L.N. accused Steadman of placing his penis *on* her vaginal area."[8]

After concluding that the evidence was legally sufficient, the court of appeals proceeded to its factual sufficiency analysis, which consisted of the following paragraph:

> However, the evidence is not factually sufficient. The record indicates that gonorrhea can also be transmitted by the male sexual organ merely touching the outside of the female sexual organ, without the male sexual organ passing beyond the labia majora. A neutral review of the evidence establishes a touching between Steadman's sexual organ and L.N.'s sexual organ, but does not establish an intrusion beyond the vaginal lips. Accordingly, we find the proof of guilt to be so weak as to render the jury's

---

[4] *Id.* at 404-06 (italics ours).

[5] *Id.* at 407.

[6] *Id.*

[7] *Id.*

[8] *Id.* (emphasis in original).

verdict clearly wrong and manifestly unjust.[9]

In a single issue presented in its petition for discretionary review, the State asks whether the Court of Appeals erred in selectively examining the appellate record for evidence that was consistent with a finding of factual insufficiency, rather than considering all the record evidence and all the reasonable inferences to be drawn therefrom?

## II. ANALYSIS

In a factual sufficiency review, the appellate court views the evidence in a neutral light and asks whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust.[10]  Although a factual sufficiency review authorizes an appellate court, to a very limited degree, to act as a "thirteenth juror," the appellate court must nevertheless give the jury's verdict a great degree of deference.[11]  A "high level of skepticism about the jury's verdict" is required before an appellate court may reverse due to factual insufficiency."[12]  An appellate court may not find the evidence to be factually insufficient merely because there are "reasonably equal competing theories of causation."[13]  And a factual sufficiency reversal certainly may not occur when the evidence actually preponderates in favor of conviction.[14]  Before reversing a conviction on the basis of factual insufficiency, an

---

[9]  *Id.* at 407-08.

[10]  *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008).

[11]  *Watson v. State*, 204 S.W.3d 404, 416-17 (Tex. Crim. App. 2006).

[12]  *Id.* at 417.

[13]  *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001).

[14]  *Watson*, 204 S.W.3d at 417.

appellate court must detail all the relevant evidence and must explain in exactly what manner the evidence is factually insufficient.[15]

On its face, the court of appeals's opinion may appear to comply with these requirements, but a reading of the record reveals that the court of appeals has failed to detail all the relevant evidence. Furthermore, the court appears to have failed to give appropriate deference to the jury.

First, the court of appeals's analysis seems to rest on an inaccurate understanding of "penetration." The expert witnesses testified that penetration was anything that passed the outer lips of the female sexual organ (labia majora). Kleypas and Dr. Greene both indicated that placing an object in between the outer lips necessarily constitutes passing the outer lips, and thus constitutes penetration. Further, Kleypas testified that sexual perpetrators often get past the outer lips by "rubbing up and down." She also explained that, for girls between the ages of three and five years who have suffered sexual abuse, it is "probably ninety percent or greater that something has passed the labia majora." The frequency with which perpetrators pass the vaginal opening, though, is "very much less" because the vaginal opening is so small. Dr. Greene explained that "a male penis can't get into the vagina without totally ripping it from – totally ripping it from the vagina all the way to the rectum." Responding to a hypothetical regarding the possibility of gonorrhea being transmitted by semen contained on the perpetrator's hand, Dr. Greene also suggested that placing an object

---

[15] *Id.* at 414 (appellate court must explain "in exactly what way the State's evidence, while legally sufficient, is nevertheless too weak to withstand scrutiny, or in exactly what way it perceives the conflicting evidence to preponderate against conviction" and appellate court must review *all* the evidence in conducting its analysis); *Cain v. State*, 958 S.W.2d 404, 409-10 (Tex. Crim. App. 1997)(court of appeals ignored evidence that supported the jury verdict); *Clewis*, 922 S.W.2d at 135 (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986))(appellate court must "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient").

between the outer lips would necessarily be penetration:

> "[I]f you did it with your hand, you would have to put your hand between the labia and get on the mucus membrane, so that's still sexual assault. You know, sexual assault is with a hand *or a penis* or an object, or whatever, so you would have to be putting your hand up inside past the lips up between the labia to get the inoculum on the mucus membrane, so *either way* it would be sexual assault."[16]

This testimony is consistent with prior caselaw from this Court. In *Vernon v. State*, we agreed with the State's contention that "tactile contact beneath the fold of complainants external genitalia amounts to penetration within the meaning of the Aggravated Sexual Assault statute, since vaginal penetration is not required, but only penetration of the 'female sexual organ.'"[17]

The court of appeals acknowledged that the complainant accused appellant of placing his penis "down in her stride," but then said that the complainant did not accuse appellant of penetrating her with either his finger or his penis. It is true that the four-year-old complainant did not use the word "penetration," nor did she use any of the terms employed by the expert witnesses to refer to various parts of the female sexual organ. But we would not expect a four-year-old to use the same language used by adults, much less that used by expert witnesses.

According to the court of appeals, Kleypas explained "that gonorrhea is normally transmitted via genital to genital contact, but penetration is not necessary." But Kleypas did not testify that penetration of the female sexual organ was unnecessary. Rather, she explained that there does not have to be "penetration of the vaginal opening." As noted above, penetration of the female sexual organ can occur without penetration of the vaginal opening. The court of appeals's reference here to the "vaginal opening" and earlier to the "vaginal area" suggests that the court may have associated

---

[16] Emphasis added.

[17] 841 S.W.2d 407, 409-10 (Tex. Crim. App. 1992).

the vaginal opening with the entire female sexual organ, resulting in an mistaken understanding of the expert testimony.

Kleypas did testify that if semen contacts the mucus membranes of the inner lips, gonorrhea can be transmitted. This testimony could be construed as implicit support for the notion that the penis does not have to penetrate the female sexual organ so long as the semen does, but we find no explicit testimony by Kleypas about gonorrhea being transmitted that way. In any event, Kleypas did not say that gonorrhea could be transmitted simply by contact between the penis and the outside of the female sexual organ.

The court of appeals seems to have found significant Dr. Greene's testimony that gonorrhea can be transmitted even if the male sexual organ rubs on the outside of the vagina. But according to the expert testimony, an object that rubs the outside of the vagina has necessarily penetrated the female sexual organ.

The court of appeals interpreted Dr. Greene's testimony as saying that gonorrhea can be transmitted by the male sexual organ touching a child's sexual organ, but that conclusion oversimplifies Dr. Greene's testimony. Dr. Greene did affirm that gonorrhea could be transmitted from "a male's sexual organ on a child's genitals" and that the disease could be transmitted without semen, but she explained that a "skin to skin contact" would transmit the disease if the contact occurs "on a mucus membrane." She also explained that gonorrhea is "fairly hard to grow and culture" and is transmitted "usually" by "direct contact" or from "mucus membrane to mucus membrane."

The court of appeals acknowledged Dr. Greene's testimony that she was not one hundred percent certain that gonorrhea could be transmitted "by touching a finger with semen on it to the

child's sexual organ." But Dr. Greene also testified that there was no documentation in the literature on such a thing happening and that whether or not such a thing was possible would be "conjecture." She further testified that only one case of transmission other than from the sexual organ of the actor had been observed in the literature. In that instance, a microbiologist's child ate the agar that the gonorrhea was growing on.

Further, though the court of appeals noted Dr. Greene's testimony that the presence of gonorrhea means that the child has been "sexually abused," it seems to have discounted this testimony in its analysis. Dr. Greene testified that, "If you see gonorrhea in a four-year-old child, then you know she's been sexually assaulted." This statement was made sometime after Dr. Greene specifically defined "[p]enetration in regards to sexual assaults . . . in the State of Texas" as "penetration of the female sexual organ past the outer lips."

The court of appeals observed Dr. Greene's testimony that a child is more susceptible to infection, but it did not set forth the underlying reason for that susceptibility. Both Dr. Greene and Dr. Fader testified that this increased susceptibility was due to differences in tissue on the *inside* of the female sexual organ.

The court of appeals also stated that Dr. Fader conceded the possibility that gonorrhea could be transmitted by semen on a finger that touches the female sexual organ or rubs the outside of the vagina. The actual wording of the questions Dr. Fader was asked was whether transmission could occur by semen on a finger if it involved "rubbing it on a female's genitals" or if the perpetrator "inserts part of their [sic] finger into the vagina." We also point out that the court of appeals did not include Dr. Fader's statements regarding gonorrhea being a "fastidious organism" that "would die rather rapidly" outside the body. Transmission by semen would fail if the semen dried prior to the

touching. Dr. Fader explained that the disease organism needed a moist environment to grow. "We don't find it, for example, on our skin."

The court of appeals also noted Dr. Fader's testimony that gonorrhea is not always the result of sexual assault. But Dr. Fader's statement came immediately after he was questioned about the incident, noted above, regarding the microbiologist's child.[18] Dr. Fader expressed surprise that there was a study about a child orally swallowing gonorrhea, but he acknowledged that it was medically possible. It was immediately after that acknowledgment that Dr. Fader agreed that the transmission of gonorrhea to a child at a time other than birth was not always the result of sexual assault.

The court of appeals pointed to Dr. Fader's testimony that the Centers for Disease Control (CDC) never received the complainant's specimen, and that, had a test been performed, it would have been definitive. Although the court of appeals acknowledged that the CDC might not have been able to extract enough DNA for a test, the court did not mention Dr. Fader's testimony that the inability to obtain testing from the CDC did not really matter and that testing from the CDC was not normally sought in these types of cases.

After reviewing the record ourselves, it appears that the court of appeals made inferences in appellant's favor rather than reviewing the record in a "neutral" light. The court recited facts

---

[18] The court of appeals did not seem to suggest that the complainant could have acquired gonorrhea from her mother at birth. The complainant's mother testified that she was treated for gonorrhea and cured during pregnancy. Kleypas testified that she would not expect to find symptoms of gonorrhea in a child at birth if the mother had been treated. And as the court of appeals pointed out, the testimony indicated that an untreated mother with gonorrhea could pass it on to her child at birth, but it would show up in the eyes. When asked whether gonorrhea could be passed from the mother at birth to the child's female sexual organ, Dr. Greene testified that in her twenty years as an OB doctor she had never seen it. Further when asked whether a transfer of gonorrhea at birth could result in the manifestation of the disease in the child four years later, Dr. Fader replied, "That would be highly unlikely."

favorable to appellant's position while overlooking other evidence. The court also seems to have discounted the jury's ability to disbelieve appellant's explanation of how L.N. might have contracted gonorrhea. In short, the court failed to give the deference to the jury required by *Clewis*. Furthermore, the court of appeals should have discussed the various items of evidence and explained what role they played in its factual sufficiency determination. Finally, it appears to us that the court of appeals may have employed an incorrect understanding of the term "penetration" in its analysis.

Concluding that the court of appeals has failed in several respects to conduct a proper factual sufficiency review, we reverse its judgment and remand the case for further proceedings consistent with this opinion.

Delivered: April 1, 2009
Publish