

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-092-CR

MARK WREN BOYER                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

A jury assessed life imprisonment after finding Appellant Mark Wren Boyer guilty of two counts of fraud.[2] In four issues, Boyer appeals, complaining

---

[1]*See* Tex. R. App. P. 47.4.

[2]Specifically, one count of attempting to possess a controlled substance by misrepresentation, fraud, deception, or subterfuge by presenting a triplicate prescription in the name of Francis Boyer (his mother) for twelve Duragesic patches, and one count of possessing or obtaining a controlled substance by misrepresentation, fraud, deception, or subterfuge by receiving thirty dosage

that his right to a speedy trial was violated under the United States and Texas Constitutions and that the evidence is not legally and factually sufficient to support his convictions.[3] We affirm.

## II. Speedy Trial

In his first and second issues, Boyer complains that the trial court erred by denying him his right to a speedy trial under the Sixth Amendment to the United States Constitution and article I, section 10 of the Texas constitution.

### A. Background

Boyer was arrested on May 16, 2007, and the trial court appointed an attorney (Larry Lewis) for him on May 21, 2007. On April 3, 2008, the trial court issued an order for substitution of counsel, appointing new counsel (Bruce Harris) for Boyer and allowing Lewis to withdraw "due to a family medical leave." The State filed Boyer's indictment on December 3, 2008.

Boyer filed a comprehensive pretrial motion (to suppress, for notice of extraneous offenses, and for discovery) on March 2, 2009. The next day, he

units of hydrocodone in the name of Francis Boyer. Boyer pleaded true to two enhancement paragraphs, a felony possession-of-a-controlled-substance-with-intent-to-deliver offense and a felony offense of delivery of a controlled substance.

[3]Because Boyer challenges the legal and factual sufficiency of the evidence to support his conviction in his third and fourth issues, we will delve into the facts in conjunction with our analysis of those issues below.

filed a motion to set aside the indictment, and the trial court set it for hearing on March 6, 2009.  Trial began on March 9, 2009.

At the hearing on March 6, Boyer testified for the limited purpose of the pretrial motion to set aside the indictment.  During his direct examination, he set out the dates above (arrested on May 16, 2007; indicted on December 3, 2008), but he acknowledged that while he was waiting to be indicted, he was "on a parole hold" because his May 16 arrest was for a parole violation.  Boyer stated that until the instant case was adjudicated "they won't do anything about" his parole violation.  Acknowledging that, even if his case had been dismissed, he would not have been released from jail because of the parole hold, Boyer stated, "I would not have got out of jail until—except—unless I discharged that.  I'm under—the law I'm under on that is an old third law, they can't take away your short time, and I've got twelve years done on a twenty-five."[4]

_____

[4]During final arguments at the hearing, Boyer's counsel acknowledged,

These inmates—people who are held on parole warrants, they are put in a Catch-22 because we can't—an examining trial, a 90 day motion to get a PR bond does no good.  We can't force a speedy indictment because they've got a parole hold and no one ever does anything.  And so they just sit here.

Boyer also testified that his mother died on April 7, 2008, and that she would have been a crucial witness because she would have told the jury that Boyer was picking up her prescriptions for her. He stated that he had received a letter offering him a five-year sentence several months before the indictment, that a subsequent offer involved a year of state jail time, and that the last offer was for thirty-five years. Boyer stated that plea negotiations did not begin until approximately May or June 2008, or after Harris was appointed.[5]

On cross-examination, Boyer testified that his mother was seventy-nine at the time of the alleged offense and that she had been in poor health since her first stroke in March 1997. He also testified that he had been involved with plea negotiations before the indictment because he wanted to find out whether his parole was going to be revoked and for how long.

Boyer indicated that he knew that he had a right to be indicted before trial but that he thought filing a motion for speedy trial should have been automatic. He stated, "I wanted to—I wanted to get either indicted or not indicted I think to get on with my life." He stated that he never informed the court that he had not been indicted because he did not know which court to send his letter to.

_____

[5]An email from Harris to the State, dated April 22, 2008, indicates that a plea offer was "on the table."

Following the hearing, the trial court denied Boyer's motion to set aside the indictment. In a letter ruling, the trial court set out the following rationale for its decision:

> In the instant case, [Boyer's] right to a speedy trial attached upon his arrest on May 16, 2007. An indictment was returned against him on December 3, 2008. The delay between arrest and indictment amounts to over 18 months[] and is presumptively prejudicial to [Boyer]. During the delay, [Boyer] has been incarcerated; however, his initial incarceration arose from a parole violation warrant, not from the charges pending against him in the instant case.
>
> . . . .
>
> Other than his claim in his March 3, 2009 Motion to Set Aside Indictment, [Boyer] never asserted his right to a speedy trial. In fact, his pending motion supports an inference that he does not really want a trial, but rather a dismissal.
>
> Finally, in addition to the presumption that [Boyer] has been prejudiced by the delay between arrest and indictment, he has testified that his primary witness, his mother, died while he was waiting to be indicted. That is true, but it is also true that she was in extremely poor and fragile health at the time he was arrested. By his own admission, she had to be revived on at least one occasion. He now claims that she was his main witness, yet he never took any steps to perpetuate her testimony prior to her unfortunate death. His lack of concern in preserving her testimony until now, like his failure to ever assert his right to a speedy trial, supports an inference that he did not consider her testimony that crucial.
>
> . . . Any prejudice to [Boyer] has been diluted by his own inactions.

B. The Right to a Speedy Trial

The Sixth Amendment to the United States Constitution and article 1, section 10 of the Texas constitution guarantee an accused the right to a speedy trial. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10; *see also Zamorano v. State*, 84 S.W.3d 643, 647 (Tex. Crim. App. 2002); *Murphy v. State*, 280 S.W.3d 445, 450 (Tex. App.—Fort Worth 2009, pet. ref'd). Texas courts analyze these claims in the same way under both the federal and state constitutions. *Murphy*, 280 S.W.3d at 450. The right attaches once a person becomes an "accused," that is, once one is arrested or charged. *Id.* "[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971).

Supreme Court precedent requires state courts to analyze federal constitutional speedy trial claims "on an ad hoc basis" by weighing and then balancing the four *Barker v. Wingo* factors: (1) length of the delay, (2) reason for the delay, (3) assertion of the right, and (4) prejudice to the accused. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972); *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999); *Murphy*, 280 S.W.3d at 450. While the State has the burden of justifying the length of delay, the

6

defendant has the burden of proving the assertion of the right and showing prejudice. *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192; *see also Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973) (stating that "if an accused made a prima facie showing of prejudice, the State must carry the obligation of proving that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay"). The defendant's burden of proof on the latter two factors "varies inversely" with the State's degree of culpability for the delay. *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993) (citing *Doggett v. United States*, 505 U.S. 647, 657, 112 S. Ct. 2686, 2693 (1992)), *cert. denied*, 510 U.S. 1167 (1994). Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Cantu v. State*, 253 S.W.3d 273, 280–81 (Tex. Crim. App. 2008).

The *Barker* test is triggered by a delay that is unreasonable enough to be "presumptively prejudicial." *Doggett*, 505 U.S. at 652 n.1, 112 S. Ct. at 2691 n.1. There is no set time element that triggers the analysis, but the court of criminal appeals has held that a delay of four months is not sufficient, while a seventeen-month delay is. *See Phillips v. State*, 650 S.W.2d 396, 399 (Tex. Crim. App. 1983) (seventeen months "sufficient to raise the issue"); *Pete v.*

*State*, 501 S.W.2d 683, 687 (Tex. Crim. App. 1973) (four months not "'presumptively prejudicial'"), *cert. denied*, 415 U.S. 959 (1974); *see also Doggett*, 505 U.S. at 652 n.1, 112 S. Ct. at 2691 n.1 (noting that courts have generally found post-accusation delay "presumptively prejudicial at least as it approaches one year").

Once the *Barker* test is triggered, courts must analyze the speedy trial claim by first weighing the strength of each of the *Barker* factors and then balancing their relative weights in light of "the conduct of both the prosecution and the defendant." *Zamorano*, 84 S.W.3d at 648 (quoting *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192). No one factor is either a necessary or sufficient condition to the finding of a deprivation of the speedy trial right. *Id.* Instead, the four factors are related and must be considered together along with any other relevant circumstances. *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193. As no factor possesses "talismanic qualities," courts must engage "in a difficult and sensitive balancing process" in each individual case. *Zamorano*, 84 S.W.3d at 648 (quoting *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193).

Dismissal of the charging instrument with prejudice is mandated only upon a finding that an accused's speedy trial right was actually violated. *See Strunk v. United States*, 412 U.S. 434, 439–40, 93 S. Ct. 2260, 2263–64 (1973). Because dismissal of the charges is a radical remedy, a wooden

8

application of the *Barker* factors would infringe upon the societal interest in trying people accused of crime, rather than granting them immunization because of legal error. *Cantu*, 253 S.W.3d at 281. Thus, courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *Id.*; *see also Barker*, 407 U.S. at 534–35, 92 S. Ct. at 2192 (rejecting defendant's speedy trial claim despite five-year delay when record strongly indicated that defendant did not actually want a speedy trial). The constitutional right is that of a speedy trial, not dismissal of the charges. *Cantu*, 253 S.W.3d at 281.

C. Standard of Review

In reviewing the trial court's ruling on an appellant's speedy trial claim, we apply a bifurcated standard of review: an abuse of discretion standard for the factual components, and a de novo standard for the legal components. *Zamorano*, 84 S.W.3d at 648; *Murphy*, 280 S.W.3d at 452. Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a purely legal question. *Cantu*, 253 S.W.3d at 282.

Under this standard, we defer not only to a trial judge's resolution of disputed facts, but also to the trial judge's right to draw reasonable inferences

9

from those facts. *Id.* In assessing the evidence at a speedy trial hearing, the trial judge may completely disregard a witness's testimony, based on credibility and demeanor evaluations, even if that testimony is uncontroverted. *Id.* The trial judge may disbelieve any evidence so long as there is a reasonable and articulable basis for doing so. *Id.* And all of the evidence must be viewed in the light most favorable to the trial judge's ultimate ruling. *Id.* Because Boyer lost in the trial court on his speedy trial claim, we presume that the trial judge resolved any disputed fact issues in the State's favor, and we defer to the implied findings of fact that the record supports. *See id.*

D. Analysis

1. Length of the Delay

Boyer was arrested on May 16, 2007, and indicted over a year later, on December 3, 2008. His trial began on March 9, 2009. The trial court found, and the State concedes, that this length of time is sufficient to trigger the *Barker* inquiry. We agree that this length of time is "presumptively prejudicial." *See Murphy*, 280 S.W.3d at 452; *see also Doggett*, 505 U.S. at 652 n.1, 112 S. Ct. at 2691 n.1.

2. Reason for the Delay

In its letter ruling, the trial court concluded that the State offered no evidence of its reasons for the delay. However, the State contends Boyer's

10

testimony establishes that the parties were engaged in good faith plea bargaining, that this is a valid reason for the delay, and that it should not be weighed against the State. Because this argument is mirrored in court of criminal appeals precedent and supported by Boyer's testimony, we agree. *See Munoz*, 991 S.W.2d at 824 ("[D]elay caused by good faith plea negotiations is a valid reason for the delay and should not be weighed against the prosecution."). Furthermore, the United States Supreme Court has noted that delay caused by defense counsel is charged against the defendant because the attorney is the defendant's agent when acting, or failing to act, in furtherance of the litigation. *Vermont v. Brillon*, 129 S. Ct. 1283, 1290–91 (2009) (stating that an assigned counsel's failure "to move the case forward" does not warrant attribution of delay to the State). This factor weighs against Boyer.

3. Assertion of the Right

The third *Barker* factor requires a determination of whether Boyer asserted his right to a speedy trial. *See Barker*, 407 U.S. at 531–32, 92 S. Ct. at 2192–93; *see also Munoz*, 991 S.W.2d at 825 (placing burden on defendant to assert or demand right to speedy trial). Although a defendant's failure to timely seek a speedy trial does not amount to a waiver of the right, such failure makes it difficult for him to prevail on a speedy trial claim. *See Blaylock v.*

11

*State*, 259 S.W.3d 202, 210 (Tex. App.—Texarkana 2008, pet. ref'd), *cert. denied*, 129 S. Ct. 2861 (2009).

The State notes that Boyer does not dispute that he did not assert his right to a speedy trial prior to filing his motion to set aside the indictment on March 3, 2009, after he had already spent over a year in jail. Boyer did not request an examining trial. *See* Tex. Code Crim. Proc. Ann. art. 16.01 (Vernon 2005). And he did not seek habeas corpus relief before presentment of the indictment. *Cf. id.* art. 32.01 (Vernon 2006); *Brooks v. State*, 990 S.W.2d 278, 285 (Tex. Crim. App.), *cert. denied*, 528 U.S. 956 (1999). Furthermore, filing for a dismissal instead of a speedy trial generally weakens a speedy trial claim because it shows a desire to have *no* trial instead of a speedy one, as duly noted by the trial court here. *See Murphy*, 280 S.W.3d at 454. If a defendant fails to first seek a speedy trial before seeking dismissal of the charges, the defendant should provide cogent reasons for this failure. *See id.*

Boyer argues that because he was held on a "blue warrant,"[6] he would have remained in jail until his parole case was resolved, and the parole case would not be heard until the charges in this case were resolved. Therefore, he

---

[6]A "blue warrant" is an arrest warrant issued when a parolee has been suspected of violating the conditions of his parole. *See Blaylock*, 259 S.W.3d at 209 n.2.

12

concludes, he was "between the proverbial 'rock and a hard place' that those incarcerated on new charges and parole holds are put in."

Notwithstanding Boyer's argument, he testified at his hearing that he knew he had a right to be indicted before trial. Therefore, Boyer could have made the State aware that he wanted to be indicted earlier than December 3, 2008, but he failed to do so. And he could have filed his speedy trial complaint earlier than six days before trial on the merits. We agree with the trial court's conclusion that Boyer's motion "supports an inference that he [did] not really want a trial, but rather a dismissal." This factor weighs against Boyer.

4. Prejudice to the Accused

The final factor is prejudice to the defendant, which should be assessed in light of the interests of the defendant that the right to a speedy trial was designed to protect. *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193; *Munoz*, 991 S.W.2d at 826. These interests are: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193; *Munoz*, 991 S.W.2d at 826. Of these interests, the most important is protecting a defendant's ability to adequately prepare his case because compromise of this interest "skews the fairness of the entire system." *Munoz*, 991 S.W.2d at 826 (quoting *Barker*, 407 U.S. at 532–33,

13

92 S. Ct. at 2193). The defendant has the burden to make some showing of prejudice, although a showing of actual prejudice is not required. *Id.* When the defendant makes a prima facie showing of prejudice, the burden shifts to the State to show that the defendant suffered "no serious prejudice beyond that which ensued from the ordinary and inevitable delay." *Id.* (quoting *Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973)). The presumption of prejudice to a defendant's ability to defend himself can be "extenuated . . . by the defendant's acquiescence" in the delay. *Murphy*, 280 S.W.3d at 455 (citing *Doggett*, 505 U.S. at 658, 112 S. Ct. at 2694).

Boyer argues that his defense was impaired by the delay because his key witness—his mother—died during the delay and became unavailable. However, as the State points out, Boyer had almost a year during his incarceration to obtain his mother's statement and, despite his mother's fragile health, did nothing. Therefore, we conclude that this factor is, at best, neutral.

5. Balancing the Factors

Having addressed the *Barker* factors, we must now balance them. Weighing in favor of finding that Boyer's speedy trial right was violated are the facts that the delay here was excessive and that his "key witness" has died. Weighing against finding a violation of Boyer's speedy trial right is the fact that he asserted his right to a speedy trial in the form of a motion to dismiss on the

14

eve of trial—indicating that he did not really want a speedy trial, just a dismissal of the charges. Further, he failed to make any efforts to secure an indictment or dismissal, or to obtain his key witness's testimony, while incarcerated on a parole violation—not on the charges presented in the instant case. We hold that the weight of these factors, balanced together, supports the trial judge's decision to deny Boyer's motion and that Boyer's right to a speedy trial was not violated. *See Barker*, 407 U.S. at 534–36, 92 S. Ct. at 2194–95; *Murphy*, 280 S.W.3d at 455–56. We overrule Boyer's first two issues.

### III. Sufficiency of the Evidence

In his third and fourth issues, Boyer complains that the evidence is not legally or factually sufficient to support the jury's verdict on either fraud count.

### A. Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.

15

*Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

B. Applicable Law

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik,* 953 S.W.2d at 240. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000).

Section 481.129(a)(5)(A) of the health and safety code states that a person commits an offense if the person knowingly "possesses, obtains, or attempts to possess or obtain a controlled substance . . . by misrepresentation, fraud, forgery, deception, or subterfuge." Tex. Health & Safety Code Ann. § 481.129(a)(5)(A) (Vernon 2010). Count one of Boyer's indictment added the following to the statutory elements above: that on or about May 17, 2007, Boyer knowingly attempted to possess or obtain Fentanyl by presenting a

17

triplicate prescription issued by Dr. Gary Ozier in Francis's name for twelve

Duragesic patches that contain Fentanyl.  Count two of Boyer's indictment

added the following to the statutory elements above:  that on or about May 14,

2007, Boyer knowingly possessed or obtained dihydrocodeinone by receiving

thirty dosage units of hydrocodone 5/500 in Francis's name.

C.  Evidence

1.  Francis Boyer's Prescriptions

Dr. Ozier testified that he was Francis's family physician from 1991 until

2006 or 2007.  Both he and Glen Boyer, Boyer's older brother, testified that

Boyer was Francis's caregiver in 2006 and 2007.  Francis's last office visit with

Dr. Ozier was on November 17, 2006, and Boyer accompanied her.

Dr. Ozier stated that in late 2006 and the beginning of 2007, Francis,

who was in her early eighties, had multiple diagnoses, including

> chronic severe low back pain from spondylosis and probable spinostenosis with right sciatica[,] which caused her a lot of pain. She had chronic anxiety and depression.  She had COPD [chronic obstructive pulmonary disease] [and] was O2 [oxygen] dependant. She had gastroesophageal reflux disease, osteoporosis, coronary artery disease, status-post CVA[,] which is a stroke.

Dr. Ozier wrote prescriptions for Francis for Duragesic patches (also

known as Fentanyl, a morphine-based opiate pain reliever and a Schedule 2

controlled substance), Lortab 5 (known generically as hydrocodone 5/500, a

18

pain reliever and a Schedule 3 controlled substance), and Ativan (known generically as Lorazepam, an antianxiety drug).[7] Francis used Duragesic patches and Lortab for her chronic back pain; she took Ativan for chronic anxiety; and she was supposed to take Amiodaron once a day to treat her cardiac arrhythmia.

Dr. Ozier testified that he wrote prescriptions for Francis for Duragesic patches on December 13, 2006; January 8, 2007; March 1, 2007; April 30, 2007; and May 14, 2007. He wrote five separate prescriptions for thirty pills each of Lortab for Francis between February and May 2007. In contrast, on January 8, 2007, he wrote a prescription that was good for ten refills for the heart medicine Amiodaron. He attributed this difference in prescribing to the type of medicine involved. The pain medicine in a Duragesic patch "lasts for three days[,] . . . it's a Class 2 narcotic[,]" and requires a special triplicate prescription. It cannot just be called in to a pharmacy. He added,

> [A]s most doctors do, I make a policy not to prescribe huge amounts of amphetamines or narcotics or we do a smaller [dose] amount to try to keep track of it [because] . . . we all know the tendency for abuse of those medicines, and you want to keep up with how many they're taking to make sure they're not taking too many.

---

[7]Many of the witnesses used the trade and generic names of these drugs interchangeably. For clarity, we will refer to these drugs by their trade names: Duragesic patches, Lortab, Ativan.

Cindy Schenk, a pharmacist employed at United Pharmacy in Wichita Falls, testified that she knew Francis because Francis had been one of her customers. When Francis was no longer able to get to United to have her prescriptions filled, Boyer would pick them up for her. She identified State's Exhibit 2 as Francis's medication list, retrieved from United's secured computer, with Boyer's electronic signature from his signing for the medications when he picked them up. State's Exhibit 2 sets out the following dates, drug names, and quantities:

- 01/08/07, Amiodaron 200 mg, quantity 30;

- 01/09/07, Hydrocod/Apap 5/500 [Lortab], quantity 60;

- 01/09/07, Fentanyl [Duragesic patches] 25 mcg/hour, quantity 10;

- 01/09/07, Tylenol 500 mg, quantity 100;

- 01/16/07, Lorazepam [Ativan] 1 mg, quantity 60;

- 02/01/07, Fentanyl [Duragesic patches] 25 mcg/hour, quantity 10;

- 02/01/07, Hydrocod/Apap 5/500 [Lortab], quantity 90;

- 02/28/07, Hydroco/Apap5-500 mg [Lortab], quantity 90;

- 02/28/07, Lorazepam [Ativan] 1 mg, quantity 60;

- 03/01/07, Fentanyl [Duragesic patches] 25 mcg/hour, quantity 20;

- 04/04/07, Hydroco/Apap5-500 mg [Lortab], quantity 30;

- 04/04/07, Lorazepam [Ativan] 1 mg, quantity 30;

20

- 04/16/07, Hydroco/Apap5-500mg [Lortab], quantity 30;

- 04/30/07, Hydroco/Apap5-500mg [Lortab], quantity 30;

- 04/30/07, Lorazepam [Ativan] 1 mg, quantity 30; and

- 05/14/07, Hydroco/Apap5-500 mg [Lortab], quantity 30.

2. Francis Moves to Long Meadow in February 2007

Six days before Francis moved into Long Meadow, a long-term care facility in Justin, Texas, Glen called the Wichita Falls Police Department to see if Boyer "was in jail or something." Glen elaborated, stating,

> I probably called them to see if he was in jail. If my momma called me and said he left to go someplace and he's not back yet, then . . . I would call around to check to see if I could find him someplace. If I called and couldn't find him, then I would probably as a last result call to see if he got stopped, got picked up, or something like that.

Glen did not recall how long it was before Boyer showed back up, but he agreed that he told police that he did not believe Boyer "would go off and leave [their] 80-year-old mother alone."

Patrick Paro, a licensed registered nurse who had been Long Meadow's director of nursing, testified that Francis was admitted to Long Meadow on February 7, 2007. Francis had been living there when she died in April 2008. Paro testified that Francis received her first medications at Long Meadow on the evening of February 7, 2007. From March 2007 to May 2007, Francis received

21

Duragesic patches, Lortab, Ativan, and Amiodaron at Long Meadow, filled through American Pharmaceutical Services (APS) pharmacy, a dedicated private pharmacy for long-term care facilities. Paro testified that he was unaware that prescriptions were being filled in Francis's name in Wichita Falls while she was in Long Meadow.

Dr. Ozier testified that he received a fax from North Texas Home Health on February 7, 2007, informing him that Francis was in Long Meadow nursing home, but that no one from Long Meadow called him about Francis's medication. He stated that he was not aware that Long Meadow did not accept outside prescriptions and that he would not have written any prescriptions for Francis if he had known. He responded affirmatively when asked whether, as the treating physician of a patient moved into an assisted living or long-term nursing facility, it would be important for the patient's family to let him know whether he needed to continue to treat the patient with medication or whether the facility would take care of it.

Schenk testified that she did not know whether the prescriptions Boyer picked up from her pharmacy in February, March, and April made it to Francis, and she indicated that she would not have dispensed any of the medication if she had known that Francis was in a long-term facility that did not accept

outside prescriptions.  She testified that Boyer never told her that his mother was in such a facility.

3.  Events of May 14–16, 2007

Schenk testified that she saw Boyer on May 14, 2007.  She identified State's Exhibit 1 as a copy of Francis's prescription for Duragesic patches, issued by Dr. Ozier, that Boyer brought in on May 14.  The other prescription Boyer brought in was for thirty pills of Lortab, also issued by Dr. Ozier.  Schenk ran the prescriptions through Francis's insurance and filled the Lortab prescription, but the one for Duragesic "came back that it was a refill too soon, that it had been filled at another pharmacy."  Boyer took the thirty Lortab pills and left the pharmacy.

Schenk called Francis's insurance company and discovered that the Duragesic prescription had been filled at a pharmacy for a nursing home in Justin, Texas, and that that pharmacy had been filling prescriptions for Francis since February 7, 2007.  Schenk faxed a note to Dr. Ozier to see if he wanted United to hold the prescription or let Boyer pick it up and call the police.

On May 15, Schenk contacted Sergeant Mark Ball of the Department of Public Safety (DPS) narcotics unit.  Sergeant Ball stated that he has contact with the pharmacies in Wichita County and that there have been "quite a few" times that he has arrested people for obtaining prescriptions by fraud.  He met

23

with Schenk, and she showed him Francis's patient profile,[8] State's Exhibit 2. He noted that Francis's profile listed eight or nine prescriptions for hydrocodone, Duragesic patches, and another drug from February to May. Schenk told him that Boyer had come to the pharmacy, presented the Duragesic patch prescription, and obtained a thirty-count prescription for Lortab. In light of what Schenk told him about the long-term care facility Francis was in, he "realized that Mr. Boyer was probably obtaining these prescriptions by fraud." He contacted APS, which had filled Francis's Duragesic patch prescription on May 14, and discovered that it was a dedicated private pharmacy for long-term care facilities.[9]

Sergeant Ball testified that he waited at United for a while to see if Boyer would come back, but Boyer did not. When he went back to his office, he ran a background check on Boyer and discovered an outstanding warrant for Boyer's arrest. He confirmed the warrant and then created a plan with two or

---

[8]A "patient profile" is the list of medications that a patient develops over the course of doing business with a pharmacy.

[9]Sergeant Ball testified that long-term care facilities have dedicated private pharmacies—pharmacies not open to the public—fill their prescriptions to have control over the prescriptions and that this is a common practice. "They know they're—they're getting all their medications from that one pharmacy so they don't have 50 family members bringing in prescriptions for all the family members." Schenk stated that most nursing homes use one pharmacy.

24

three other agents "to go sit on the pharmacy and wait for Mr. Boyer to show up." They went back and waited around three hours, but Boyer did not return. He advised pharmacy personnel to call him when Boyer came back.

When Boyer returned to United on May 16 to pick up the Duragesic patches, Schenk notified the DPS narcotics unit. Lieutenant Allen Navarro and Sergeant Jeff Ashburn responded. Sergeant Ashburn testified that he and Lieutenant Navarro went to United and arrested Boyer. After arresting him, they performed a search incident to arrest on Boyer and discovered a prescription pill bottle in Francis's name, admitted in evidence as State's Exhibit 3.

Schenk testified that State's Exhibit 3 was a pharmacy bottle filled at United for Francis with a prescription number that corresponded with the thirty-count generic Lortab (hydrocodone) filled on May 14, 2007. The pill bottle contained four pills. The prescription itself called for one pill every four to six hours. In light of these dosing instructions, Schenk responded, "No," when asked whether someone should take twenty-seven of the thirty pills in forty-eight hours.[10]

---

[10]Sergeant Ball testified that the officers were advised that someone had stolen Francis's medication while Boyer was asleep but that they had not received this information prior to May 16 and Boyer's arrest.

Of the four pills (State's Exhibits 4A and 4B) in the pill bottle, one was a Watson 349 Dihydrocodeinone dosage unit and another was a dosage unit of Dihydrocodeinone marked M358. Dihydrocodeinone is a derivative of hydrocodone. Sergeant Ashburn explained that Watson 349 dosage units contain five milligrams of Dihydrocodeinone with 500 milligrams of Acetaminophen, while M358 contains 7.5 milligrams of Dihydrocodeinone along with 500 milligrams of Acetaminophen. Schenk testified that the hydrocodone Francis was typically prescribed, at least since January 1, 2007, was for 5/500s, "not 7.5s." The parties stipulated to the DPS drug analysis lab report, which stated that the pills contained Dihydrocodeinone.

Lieutenant Navarro testified that he called Long Meadow and spoke with Paro on May 16, the date of Boyer's arrest. He never spoke to Francis. Paro stated that Long Meadow has a contract with APS for its residents' medications; that, for the residents' safety, they do not accept outside medication (i.e., avoiding duplication of doses); and that Long Meadow requires a doctor's order before it will accept medication through outside prescriptions. However, he acknowledged on cross-examination that relatives are not searched for outside medicine when they visit, and he acknowledged that his records did not state that Boyer was told not to give his mother medication. On redirect, he testified that it would have been dangerous and potentially

26

lethal for Francis to receive outside medication in addition to the same medication she was receiving at Long Meadow and gave the following testimony:

> Q. Now, had somebody put another [Duragesic] patch on [Francis] after she had already been given a patch by the nurse, would the nursing staff have noticed?
>
> A. We monitor the site where we've put the patch.
>
> Q. Uh-huh. And so if somebody put it on the other arm and there was already one on the other arm or wherever you place it, would that be noted in the charts and somebody been made aware it's twice the dosage?
>
> A. Yes.
>
> Q. And was that indicated anywhere in the medical records?
>
> A. No, ma'am.

Glen stated that no one at Long Meadow ever told him not to bring his mother any outside medication and that he did not know whether she ever received any outside medication. He stated that he never saw anyone bring medicine in.

Sergeant Ball testified that Duragesic patches go for between $50 and $100 each "on the street." He testified that hydrocodone (Lortab)—in his opinion, the most widely abused prescription drug on the street—has a street

27

value from $3 to $5 per pill, and the street value of a single antianxiety pill could be up to $1 or $2.

## D. Sufficiency Analysis

Boyer states that his appeal's focus is on the legal and factual insufficiency of the evidence to support the jury's finding that he used misrepresentation, fraud, deception, or subterfuge in securing the prescription medication. He argues that it is clear "that no rational trier of fact could find that [he] acted in such a way and therefore was criminally liable for picking up his mother's medications[,] [s]omething he had done with the knowledge of a doctor, a pharmacist, and the patient for a number of years." In support of his argument, he relies on testimony of Dr. Ozier, Schenk, and Boyer's brother that they did not know Francis's facility would not allow outside medications and that "[n]owhere in Francis Boyer's medical chart from the facility was it noted that outside meds were not allowed or that Mark Boyer was told of such a policy." He further argues that "[t]o misrepresent facts[,] one has to know of their existence," and he complains that the State never bothered to interview Francis about this while she was alive.

### 1. Legal Sufficiency: Counts One and Two

The record reflects that Dr. Ozier issued a triplicate prescription in Francis's name for twelve Duragesic patches containing Fentanyl and that Boyer

28

attempted to obtain them by presenting that prescription at United and attempting to get it filled on May 14. And the evidence shows that Dr. Ozier issued a prescription in Francis's name for Lortab and that Boyer filled the prescription at United on May 14. This occurred while Francis was already receiving the same medications through Long Meadow and had been receiving them there for some time.

With regard to Boyer's mens rea challenge, we observe that the standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In determining the legal sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). Based on testimony about Boyer's possession of a thirty-count pill bottle in Francis's name with only four remaining pills (one of which was not a Lortab 5/500 but rather

Dihydrocodeinone in a higher dosage),[11] when he filled the prescription only two days before, as well as testimony that Long Meadow was giving Francis her prescription medications directly, we conclude that a rational trier of fact could have found that Boyer possessed the intent necessary for conviction on both counts. Therefore, viewing all of the evidence in the light most favorable to the prosecution, we conclude that the evidence was legally sufficient to convict Boyer on counts one and two. We overrule Boyer's third issue.

2. Factual Sufficiency: Counts One and Two

In addition to the evidence discussed above, the jury also saw the sheer number of prescriptions for Lortab and Duragesic patches that Boyer filled under Francis's name from January to May. It could have noted the contrast between the frequency that he filled these prescriptions and how often he filled Francis's heart medication, Amiodarone—that is, once, on January 8, 2007, for thirty pills—when she was supposed to take Amiodarone every day. The jury heard Dr. Ozier affirm that it was important for either the patient's family—that is, the patient's primary caregiver, in this case, Boyer—or the long-term facility to let

_____

[11]When asked how a prescription is filled, Schenk testified that pills are transferred from large containers, containing 500 to 1,000 pills, to the small thirty-count bottles and that their tech counts the pills the first time and then a pharmacist counts them "on the controllers for the amount that is on the prescription."

the treating physician know about how the patient would be receiving medication. And since Boyer was Francis's primary caregiver, the jury could have decided that Boyer had the responsibility to notify Long Meadow about Francis's prescriptions and to notify Dr. Ozier and United about Francis's relocation to Long Meadow. Because their testimonies indicate that he did not, the jury could have concluded that he decided to take advantage of the situation instead.

Additionally, although Paro testified that relatives are not searched for outside medicine and acknowledged that his records did not state that Boyer was told not to give his mother medication, he also testified that the Long Meadow nursing staff would have noticed if someone had put another Duragesic patch on Francis beyond what she had been prescribed at the facility. He testified that it would have been dangerous and potentially lethal if someone had dosed Francis with outside medication in addition to what she was already receiving. As Francis did not die until a year later, when Boyer had already been arrested, the jury could have concluded that Boyer was not delivering to Francis the outside medications that he collected using her prescriptions—that is, that he was misrepresenting to Dr. Ozier and United that he was actually delivering the medicines to Francis. And Glen testified that he never saw anyone bring medicine in. Viewing all of the evidence in a neutral light, we

31

conclude that the evidence supporting the conviction is not so weak that the jury's determination is clearly wrong and manifestly unjust or that conflicting evidence so greatly outweighs the evidence supporting the conviction that the jury's determination is manifestly unjust. *See Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. Therefore, we hold that the evidence is also factually sufficient to support Boyer's convictions on counts one and two, and we overrule his fourth issue.

## IV. Conclusion

Having overruled all of Boyer's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, J.; LIVINGSTON, C.J.; and MEIER, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 31, 2010

32