COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-092-CR

 

 

MARK WREN BOYER                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM
THE 30TH DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction








A jury
assessed life imprisonment after finding Appellant Mark Wren Boyer guilty of
two counts of fraud.[2]  In four issues, Boyer appeals, complaining
that his right to a speedy trial was violated under the United States and Texas
Constitutions and that the evidence is not legally and factually sufficient to
support his convictions.[3]  We affirm.

II.  Speedy
Trial

In his
first and second issues, Boyer complains that the trial court erred by denying
him his right to a speedy trial under the Sixth Amendment to the United States
Constitution and article I, section 10 of the Texas constitution.

A.  Background

Boyer
was arrested on May 16, 2007, and the trial court appointed an attorney (Larry
Lewis) for him on May 21, 2007.  On April
3, 2008, the trial court issued an order for substitution of counsel,
appointing new counsel (Bruce Harris) for Boyer and allowing Lewis to withdraw Adue to a
family medical leave.@ 
The State filed Boyer=s
indictment on December 3, 2008.








Boyer
filed a comprehensive pretrial motion (to suppress, for notice of extraneous
offenses, and for discovery) on March 2, 2009. 
The next day, he filed a motion to set aside the indictment, and the
trial court set it for hearing on March 6, 2009.  Trial began on March 9, 2009.

At the
hearing on March 6, Boyer testified for the limited purpose of the pretrial
motion to set aside the indictment. 
During his direct examination, he set out the dates above (arrested on
May 16, 2007; indicted on December 3, 2008), but he acknowledged that while he
was waiting to be indicted, he was Aon a
parole hold@ because his May 16 arrest was
for a parole violation.  Boyer stated
that until the instant case was adjudicated Athey won=t do
anything about@ his parole violation.  Acknowledging that, even if his case had been
dismissed, he would not have been released from jail because of the parole
hold, Boyer stated, AI would not have got out of jail
untilCexceptCunless I
discharged that.  I=m underCthe law
I=m under
on that is an old third law, they can=t take
away your short time, and I=ve got
twelve years done on a twenty-five.@[4]








Boyer
also testified that his mother died on April 7, 2008, and that she would have
been a crucial witness because she would have told the jury that Boyer was
picking up her prescriptions for her.  He
stated that he had received a letter offering him a five-year sentence several
months before the indictment, that a subsequent offer involved a year of state
jail time, and that the last offer was for thirty-five years.  Boyer stated that plea negotiations did not
begin until approximately May or June 2008, or after Harris was appointed.[5]


On
cross-examination, Boyer testified that his mother was seventy-nine at the time
of the alleged offense and that she had been in poor health since her first
stroke in March 1997.  He also testified
that he had been involved with plea negotiations before the indictment because
he wanted to find out whether his parole was going to be revoked and for how
long. 

Boyer
indicated that he knew that he had a right to be indicted before trial but that
he thought filing a motion for speedy trial should have been automatic. He
stated, AI wanted
toCI wanted
to get either indicted or not indicted I think to get on with my life.@  He stated that he never informed the court
that he had not been indicted because he did not know which court to send his
letter to.








Following
the hearing, the trial court denied Boyer=s motion
to set aside the indictment.  In a letter
ruling, the trial court set out the following rationale for its decision:

In the instant case, [Boyer=s] right to a speedy
trial attached upon his arrest on May 16, 2007. 
An indictment was returned against him on December 3, 2008.  The delay between arrest and indictment
amounts to over 18 months[] and is presumptively prejudicial to [Boyer].  During the delay, [Boyer] has been
incarcerated; however, his initial incarceration arose from a parole violation
warrant, not from the charges pending against him in the instant case.

 

. . . .

 

Other than his claim in his March 3, 2009 Motion
to Set Aside Indictment, [Boyer] never asserted his right to a speedy
trial. In fact, his pending motion supports an inference that he does not
really want a trial, but rather a dismissal.

 

Finally, in addition to the presumption that
[Boyer] has been prejudiced by the delay between arrest and indictment, he has
testified that his primary witness, his mother, died while he was waiting to be
indicted.  That is true, but it is also
true that she was in extremely poor and fragile health at the time he was
arrested.  By his own admission, she had
to be revived on at least one occasion. 
He now claims that she was his main witness, yet he never took any steps
to perpetuate her testimony prior to her unfortunate death.  His lack of concern in preserving her
testimony until now, like his failure to ever assert his right to a speedy
trial, supports an inference that he did not consider her testimony that
crucial.

 

. .
.  Any prejudice to [Boyer] has been
diluted by his own inactions.

 








B.  The Right to a Speedy Trial

The
Sixth Amendment to the United States Constitution and article 1, section 10 of
the Texas constitution guarantee an accused the right to a speedy trial.  See U.S. Const. amend. VI; Tex. Const.
art. I, ' 10; see
also Zamorano v. State, 84 S.W.3d 643, 647 (Tex. Crim. App. 2002); Murphy
v. State, 280 S.W.3d 445, 450 (Tex. App.CFort
Worth 2009, pet. ref=d).  Texas courts analyze these claims in the same
way under both the federal and state constitutions.  Murphy, 280 S.W.3d at 450.  The right attaches once a person becomes an Aaccused,@ that
is, once one is arrested or charged.  Id. A[I]t is
either a formal indictment or information or else the actual restraints imposed
by arrest and holding to answer a criminal charge that engage the particular
protections of the speedy trial provision of the Sixth Amendment.@ United
States v. Marion, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971).  








Supreme
Court precedent requires state courts to analyze federal constitutional speedy
trial claims Aon an ad hoc basis@ by
weighing and then balancing the four Barker v. Wingo factors:  (1) length of the delay, (2) reason for the
delay, (3) assertion of the right, and (4) prejudice to the accused.  Barker v. Wingo, 407 U.S. 514, 530, 92
S. Ct. 2182, 2192 (1972); State v. Munoz, 991 S.W.2d 818, 821 (Tex.
Crim. App. 1999); Murphy, 280 S.W.3d at 450.  While the State has the burden of justifying
the length of delay, the defendant has the burden of proving the assertion of
the right and showing prejudice.  See
Barker, 407 U.S. at 531, 92 S. Ct. at 2192; see also Ex parte McKenzie,
491 S.W.2d 122, 123 (Tex. Crim. App. 1973) (stating that Aif an
accused made a prima facie showing of prejudice, the State must carry the
obligation of proving that the accused suffered no serious prejudice beyond
that which ensued from the ordinary and inevitable delay@).  The defendant=s burden
of proof on the latter two factors Avaries
inversely@ with the State=s degree
of culpability for the delay.  Robinson
v. Whitley, 2 F.3d 562, 570 (5th Cir. 1993) (citing Doggett v. United
States, 505 U.S. 647, 657, 112 S. Ct. 2686, 2693 (1992)), cert. denied,
510 U.S. 1167 (1994).  Thus, the greater
the State=s bad faith or official
negligence and the longer its actions delay a trial, the less a defendant must
show actual prejudice or prove diligence in asserting his right to a speedy
trial.  Cantu v. State, 253 S.W.3d
273, 280B81 (Tex.
Crim. App. 2008).








The Barker
test is triggered by a delay that is unreasonable enough to be Apresumptively
prejudicial.@ 
Doggett, 505 U.S. at 652 n.1, 112 S. Ct. at 2691 n.1.  There is no set time element that triggers
the analysis, but the court of criminal appeals has held that a delay of four
months is not sufficient, while a seventeen‑month delay is.  See Phillips v. State, 650 S.W.2d 396,
399 (Tex. Crim. App. 1983) (seventeen months Asufficient
to raise the issue@); Pete v. State, 501
S.W.2d 683, 687 (Tex. Crim. App. 1973) (four months not A>presumptively
prejudicial=@), cert.
denied, 415 U.S. 959 (1974); see also Doggett, 505 U.S. at 652 n.1,
112 S. Ct. at 2691 n.1 (noting that courts have generally found post‑accusation
delay Apresumptively
prejudicial at least as it approaches one year@).  

Once the
Barker test is triggered, courts must analyze the speedy trial claim by
first weighing the strength of each of the Barker factors and then
balancing their relative weights in light of Athe
conduct of both the prosecution and the defendant.@  Zamorano, 84 S.W.3d at 648 (quoting Barker,
407 U.S. at 530, 92 S. Ct. at 2192).  No
one factor is either a necessary or sufficient condition to the finding of a
deprivation of the speedy trial right.  Id.  Instead, the four factors are related and
must be considered together along with any other relevant circumstances.  Barker, 407 U.S. at 533, 92 S. Ct. at
2193.  As no factor possesses Atalismanic
qualities,@ courts must engage Ain a
difficult and sensitive balancing process@ in each
individual case.  Zamorano, 84
S.W.3d at 648 (quoting Barker, 407 U.S. at 533, 92 S. Ct. at 2193).








Dismissal
of the charging instrument with prejudice is mandated only upon a finding that
an accused=s speedy trial right was
actually violated.  See Strunk v.
United States, 412 U.S. 434, 439B40, 93
S. Ct. 2260, 2263B64 (1973). Because dismissal of
the charges is a radical remedy, a wooden application of the Barker
factors would infringe upon the societal interest in trying people accused of
crime, rather than granting them immunization because of legal error.  Cantu, 253 S.W.3d at 281.  Thus, courts must apply the Barker
balancing test with common sense and sensitivity to ensure that charges are
dismissed only when the evidence shows that a defendant=s actual
and asserted interest in a speedy trial has been infringed.  Id.; see also Barker, 407 U.S.
at 534B35, 92
S. Ct. at 2192 (rejecting defendant=s speedy
trial claim despite  five‑year
delay when record strongly indicated that defendant did not actually want a
speedy trial).  The constitutional right
is that of a speedy trial, not dismissal of the charges.  Cantu, 253 S.W.3d at 281.

C.  Standard of Review

In
reviewing the trial court=s ruling on an appellant=s speedy
trial claim, we apply a bifurcated standard of review:  an abuse of discretion standard for the
factual components, and a de novo standard for the legal components. Zamorano,
84 S.W.3d at 648; Murphy, 280 S.W.3d at 452.  Review of the individual Barker
factors necessarily involves fact determinations and legal conclusions, but the
balancing test as a whole is a purely legal question.  Cantu, 253 S.W.3d at 282.








Under
this standard, we defer not only to a trial judge=s
resolution of disputed facts, but also to the trial judge=s right
to draw reasonable inferences from those facts. 
Id.  In assessing the
evidence at a speedy trial hearing, the trial judge may completely disregard a
witness=s
testimony, based on credibility and demeanor evaluations, even if that
testimony is uncontroverted.  Id.  The trial judge may disbelieve any evidence
so long as there is a reasonable and articulable basis for doing so.  Id. 
And all of the evidence must be viewed in the light most favorable to
the trial judge=s ultimate ruling.  Id. 
Because Boyer lost in the trial court on his speedy trial claim, we presume
that the trial judge resolved any disputed fact issues in the State=s favor,
and we defer to the implied findings of fact that the record supports.  See id.

D.  Analysis

1.  Length of the Delay

Boyer
was arrested on May 16, 2007, and indicted over a year later, on December 3,
2008.  His trial began on March 9,
2009.  The trial court found, and the
State concedes, that this length of time is sufficient to trigger the Barker
inquiry.  We agree that this length of
time is Apresumptively
prejudicial.@ 
See Murphy, 280 S.W.3d at 452; see also Doggett,
505 U.S. at 652 n.1, 112 S. Ct. at 2691 n.1. 

2.  Reason for the Delay








In its
letter ruling, the trial court concluded that the State offered no evidence of
its reasons for the delay.  However, the
State contends Boyer=s testimony establishes that the
parties were engaged in good faith plea bargaining, that this is a valid reason
for the delay, and that it should not be weighed against the State.  Because this argument is mirrored in court of
criminal appeals precedent and supported by Boyer=s
testimony, we agree.  See Munoz,
991 S.W.2d at 824 (A[D]elay caused by good faith
plea negotiations is a valid reason for the delay and should not be weighed
against the prosecution.@).  Furthermore, the United States Supreme Court
has noted that delay caused by defense counsel is charged against the defendant
because the attorney is the defendant=s agent
when acting, or failing to act, in furtherance of the litigation.  Vermont v. Brillon, 129 S. Ct. 1283,
1290B91
(2009) (stating that an assigned counsel=s
failure Ato move
the case forward@ does not warrant attribution of
delay to the State).  This factor weighs
against Boyer.

3.  Assertion of the Right








The
third Barker factor requires a determination of whether Boyer asserted
his right to a speedy trial.  See Barker,
407 U.S. at 531B32, 92 S. Ct. at 2192B93; see
also Munoz, 991 S.W.2d at 825 (placing burden on defendant to assert or
demand right to speedy trial).  Although
a defendant=s failure to timely seek a
speedy trial does not amount to a waiver of the right, such failure makes it
difficult for him to prevail on a speedy trial claim.  See Blaylock v. State, 259 S.W.3d 202,
210 (Tex. App.CTexarkana 2008, pet. ref=d), cert.
denied, 129 S. Ct. 2861 (2009).

The
State notes that Boyer does not dispute that he did not assert his right to a
speedy trial prior to filing his motion to set aside the indictment on March 3,
2009, after he had already spent over a year in jail.  Boyer did not request an examining trial.  See Tex. Code Crim. Proc. Ann. art.
16.01 (Vernon 2005).  And he did not seek
habeas corpus relief before presentment of the indictment.  Cf. id. art. 32.01 (Vernon 2006); Brooks
v. State, 990 S.W.2d 278, 285 (Tex. Crim. App.), cert. denied, 528
U.S. 956 (1999).  Furthermore, filing for
a dismissal instead of a speedy trial generally weakens a speedy trial claim
because it shows a desire to have no trial instead of a speedy one, as
duly noted by the trial court here.  See
Murphy, 280 S.W.3d at 454.  If a
defendant fails to first seek a speedy trial before seeking dismissal of the
charges, the defendant should provide cogent reasons for this failure.  See id. 








Boyer
argues that because he was held on a Ablue
warrant,@[6] he
would have remained in jail until his parole case was resolved, and the parole
case would not be heard until the charges in this case were resolved.  Therefore, he concludes, he was Abetween
the proverbial >rock and a hard place= that
those incarcerated on new charges and parole holds are put in.@ 

Notwithstanding
Boyer=s
argument, he testified at his hearing that he knew he had a right to be
indicted before trial.  Therefore, Boyer
could have made the State aware that he wanted to be indicted earlier than
December 3, 2008, but he failed to do so. 
And he could have filed his speedy trial complaint earlier than six days
before trial on the merits.  We agree
with the trial court=s conclusion that Boyer=s motion
Asupports
an inference that he [did] not really want a trial, but rather a dismissal.@  This factor weighs against Boyer.

4.  Prejudice to the Accused








The
final factor is prejudice to the defendant, which should be assessed in light
of the interests of the defendant that the right to a speedy trial was designed
to protect.  Barker, 407 U.S. at
532, 92 S. Ct. at 2193; Munoz, 991 S.W.2d at 826. These interests
are:  (1) preventing oppressive pretrial
incarceration; (2) minimizing the anxiety and concern of the accused; and (3)
limiting the possibility that the defense will be impaired.  Barker, 407 U.S. at 532, 92 S. Ct. at
2193; Munoz, 991 S.W.2d at 826.  Of
these interests, the most important is protecting a defendant=s
ability to adequately prepare his case because compromise of this interest Askews
the fairness of the entire system.@  Munoz, 991 S.W.2d at 826 (quoting Barker,
407 U.S. at 532B33, 92 S. Ct. at 2193).  The defendant has the burden to make some
showing of prejudice, although a showing of actual prejudice is not required.  Id. 
When the defendant makes a prima facie showing of prejudice, the burden
shifts to the State to show that the defendant suffered Ano
serious prejudice beyond that which ensued from the ordinary and inevitable
delay.@  Id. (quoting Ex parte McKenzie,
491 S.W.2d 122, 123 (Tex. Crim. App. 1973)). 
The presumption of prejudice to a defendant=s
ability to defend himself can be Aextenuated
. . . by the defendant=s acquiescence@ in the
delay.  Murphy, 280 S.W.3d at 455
(citing Doggett, 505 U.S. at 658, 112 S. Ct. at 2694). 

Boyer
argues that his defense was impaired by the delay because his key witnessChis
motherCdied
during the delay and became unavailable. 
However, as the State points out, Boyer had almost a year during his
incarceration to obtain his mother=s
statement and, despite his mother=s
fragile health, did nothing.  Therefore,
we conclude that this factor is, at best, neutral.

5.  Balancing the Factors








Having
addressed the Barker factors, we must now balance them. Weighing in
favor of finding that Boyer=s speedy
trial right was violated are the facts that the delay here was excessive and
that his Akey witness@ has
died. Weighing against finding a violation of Boyer=s speedy
trial right is the fact that he asserted his right to a speedy trial in the
form of a motion to dismiss on the eve of trialCindicating
that he did not really want a speedy trial, just a dismissal of the
charges.  Further, he failed to make any
efforts to secure an indictment or dismissal, or to obtain his key witness=s
testimony, while incarcerated on a parole violationCnot on
the charges presented in the instant case. 
We hold that the weight of these factors, balanced together, supports
the trial judge=s decision to deny Boyer=s motion
and that Boyer=s right to a speedy trial was
not violated.  See Barker, 407
U.S. at 534B36, 92 S. Ct. at 2194B95; Murphy,
280 S.W.3d at 455B56.  We overrule Boyer=s first
two issues.

III. 
Sufficiency of the Evidence

In his
third and fourth issues, Boyer complains that the evidence is not legally or
factually sufficient to support the jury=s
verdict on either fraud count.

A.  Standards of Review

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party. Steadman
v. State, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); Watson v. State,
204 S.W.3d 404, 414 (Tex. Crim. App. 2006). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Steadman, 280 S.W.3d at
246; Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, although legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.  

Unless
we conclude that it is necessary to correct manifest injustice, we must give
due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000); see Steadman, 280 S.W.3d at 246.  Evidence is always factually sufficient when
it preponderates in favor of the conviction. 
Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d at
417.  

 

 








B.  Applicable Law

The
sufficiency of the evidence should be measured by the elements of the offense
as defined by the hypothetically correct jury charge for the case, not the
charge actually given.  Hardy v. State,
281 S.W.3d 414, 421 (Tex. Crim. App. 2009); Malik v. State, 953 S.W.2d
234, 240 (Tex. Crim. App. 1997).  Such a
charge is one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily restrict the State=s
theories of liability, and adequately describes the particular offense for
which the defendant was tried.  Gollihar
v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik, 953
S.W.2d at 240.  The law as authorized by
the indictment means the statutory elements of the charged offense as modified
by the factual details and legal theories contained in the charging
instrument.  See Curry v. State,
30 S.W.3d 394, 404B05 (Tex. Crim. App. 2000).








Section
481.129(a)(5)(A) of the health and safety code states that a person commits an
offense if the person knowingly Apossesses,
obtains, or attempts to possess or obtain a controlled substance . . . by
misrepresentation, fraud, forgery, deception, or subterfuge.@  Tex. Health & Safety Code Ann. ' 481.129(a)(5)(A)
(Vernon 2010).  Count one of Boyer=s
indictment added the following to the statutory elements above:  that on or about May 17, 2007, Boyer
knowingly attempted to possess or obtain Fentanyl by presenting a triplicate
prescription issued by Dr. Gary Ozier in Francis=s name
for twelve Duragesic patches that contain Fentanyl.  Count two of Boyer=s
indictment added the following to the statutory elements above:  that on or about May 14, 2007, Boyer
knowingly possessed or obtained dihydrocodeinone by receiving thirty dosage
units of hydrocodone 5/500 in Francis=s name. 

C.  Evidence

1.  Francis Boyer=s
Prescriptions

Dr.
Ozier testified that he was Francis=s family
physician from 1991 until 2006 or 2007. 
Both he and Glen Boyer, Boyer=s older
brother, testified that Boyer was Francis=s
caregiver in 2006 and 2007.  Francis=s last
office visit with Dr. Ozier was on November 17, 2006, and Boyer accompanied
her.

Dr.
Ozier stated that in late 2006 and the beginning of 2007, Francis, who was in
her early eighties, had multiple diagnoses, including 

chronic severe low back pain
from spondylosis and probable spinostenosis with right sciatica[,] which caused
her a lot of pain. She had chronic anxiety and depression.  She had COPD [chronic obstructive pulmonary
disease] [and] was O2 [oxygen] dependant. She had gastroesophageal reflux
disease, osteoporosis, coronary artery disease, status-post CVA[,] which is a
stroke.








Dr.
Ozier wrote prescriptions for Francis for Duragesic patches (also known as Fentanyl,
a morphine-based opiate pain reliever and a Schedule 2 controlled substance),
Lortab 5 (known generically as hydrocodone 5/500, a pain reliever and a
Schedule 3 controlled substance), and Ativan (known generically as Lorazepam,
an antianxiety drug).[7]  Francis used Duragesic patches and Lortab for
her chronic back pain; she took Ativan for chronic anxiety; and she was
supposed to take Amiodaron once a day to treat her cardiac arrhythmia.

Dr.
Ozier testified that he wrote prescriptions for Francis for Duragesic patches
on December 13, 2006; January 8, 2007; March 1, 2007; April 30, 2007; and May
14, 2007.  He wrote five separate
prescriptions for thirty pills each of Lortab for Francis between February and
May 2007.  In contrast, on January 8,
2007, he wrote a prescription that was good for ten refills for the heart medicine
Amiodaron.  He attributed this difference
in prescribing to the type of medicine involved.  The pain medicine in a Duragesic patch Alasts
for three days[,] . . . it=s a Class
2 narcotic[,]@ and  requires a special triplicate
prescription.  It cannot just be called
in to a pharmacy.  He added, 

[A]s most doctors do, I make a policy not to prescribe huge amounts of
amphetamines or narcotics or we do a smaller [dose] amount to try to keep track
of it [because] . . . we all know the tendency for abuse of those medicines,
and you want to keep up with how many they=re taking to make sure they=re not taking too many.








Cindy
Schenk, a pharmacist employed at United Pharmacy in Wichita Falls, testified
that she knew Francis because Francis had been one of her customers.  When Francis was no longer able to get to
United to have her prescriptions filled, Boyer would pick them up for her.  She identified State=s
Exhibit 2 as Francis=s medication list, retrieved
from United=s secured computer, with Boyer=s
electronic signature from his signing for the medications when he picked them
up.  State=s
Exhibit 2 sets out the following dates, drug names, and quantities:

$       
01/08/07, Amiodaron 200 mg, quantity 30;

$       
01/09/07, Hydrocod/Apap 5/500 [Lortab], quantity
60;

$       
01/09/07, Fentanyl [Duragesic patches] 25
mcg/hour, quantity 10;

$       
01/09/07, Tylenol 500 mg, quantity 100;

$       
01/16/07, Lorazepam [Ativan] 1 mg, quantity 60;

$       
02/01/07, Fentanyl [Duragesic patches] 25
mcg/hour, quantity 10;

$       
02/01/07, Hydrocod/Apap 5/500 [Lortab], quantity
90;

$       
02/28/07, Hydroco/Apap5-500 mg [Lortab], quantity
90;

$       
02/28/07, Lorazepam [Ativan] 1 mg, quantity 60;

$       
03/01/07, Fentanyl [Duragesic patches] 25
mcg/hour, quantity 20;

$       
04/04/07, Hydroco/Apap5-500 mg [Lortab], quantity
30;

$       
04/04/07, Lorazepam [Ativan] 1 mg, quantity 30;








$       
04/16/07, Hydroco/Apap5-500mg [Lortab], quantity
30;

$       
04/30/07, Hydroco/Apap5-500mg [Lortab], quantity
30;

$       
04/30/07, Lorazepam [Ativan] 1 mg, quantity 30;
and

$       
05/14/07, Hydroco/Apap5-500 mg [Lortab], quantity
30.

2.  Francis Moves to Long Meadow in
February 2007

Six days before Francis moved into Long Meadow, a
long-term care facility in Justin, Texas, Glen called the Wichita Falls Police
Department to see if Boyer Awas in jail or something.@  Glen elaborated, stating,

 

I probably called them to see if
he was in jail.  If my momma called me
and said he left to go someplace and he=s not
back yet, then . . . I would call around to check to see if I
could find him someplace.  If I called
and couldn=t find him, then I would
probably as a last result call to see if he got stopped, got picked up, or
something like that.

Glen did not recall how long it
was before Boyer showed back up, but he agreed that he told police that he did
not believe Boyer Awould go off and leave [their]
80-year-old mother alone.@








Patrick
Paro, a licensed registered nurse who had been Long Meadow=s
director of nursing, testified that Francis was admitted to Long Meadow on February
7, 2007.  Francis had been living there
when she died in April 2008. Paro testified that Francis received her first
medications at Long Meadow on the evening of February 7, 2007.  From March 2007 to May 2007, Francis received
Duragesic patches, Lortab, Ativan, and Amiodaron at Long Meadow, filled through
American Pharmaceutical Services (APS) pharmacy, a dedicated private pharmacy
for long-term care facilities.  Paro
testified that he was unaware that prescriptions were being filled in Francis=s name
in Wichita Falls while she was in Long Meadow.

Dr.
Ozier testified that he received a fax from North Texas Home Health on February
7, 2007, informing him that Francis was in Long Meadow nursing home, but that
no one from Long Meadow called him about Francis=s
medication.  He stated that he was not
aware that Long Meadow did not accept outside prescriptions and that he would
not have written any prescriptions for Francis if he had known.  He responded affirmatively when asked
whether, as the treating physician of a patient moved into an assisted living
or long-term nursing facility, it would be important for the patient=s family
to let him know whether he needed to continue to treat the patient with
medication or whether the facility would take care of it.








Schenk
testified that she did not know whether the prescriptions Boyer picked up from
her pharmacy in February, March, and April made it to Francis, and she
indicated that she would not have dispensed any of the medication if she had
known that Francis was in a long-term facility that did not accept outside
prescriptions.  She testified that Boyer
never told her that his mother was in such a facility.

3.  Events of May 14B16, 2007

Schenk
testified that she saw Boyer on May 14, 2007. 
She identified State=s
Exhibit 1 as a copy of Francis=s
prescription for Duragesic patches, issued by Dr. Ozier, that Boyer brought in
on May 14.  The other prescription Boyer
brought in was for thirty pills of Lortab, also issued by Dr. Ozier.  Schenk ran the prescriptions through Francis=s
insurance and filled the Lortab prescription, but the one for Duragesic Acame
back that it was a refill too soon, that it had been filled at another
pharmacy.@ 
Boyer took the thirty Lortab pills and left the pharmacy. 

Schenk
called Francis=s insurance company and
discovered that the Duragesic prescription had been filled at a pharmacy for a
nursing home in Justin, Texas, and that that pharmacy had been filling
prescriptions for Francis since February 7, 2007.  Schenk faxed a note to Dr. Ozier to see if he
wanted United to hold the prescription or let Boyer pick it up and call the
police.








On May
15, Schenk contacted Sergeant Mark Ball of the Department of Public Safety
(DPS) narcotics unit.  Sergeant Ball
stated that he has contact with the pharmacies in Wichita County and that there
have been Aquite a few@ times
that he has arrested people for obtaining prescriptions by fraud.  He met with Schenk, and she showed him
Francis=s
patient profile,[8]
State=s
Exhibit 2. He noted that Francis=s
profile listed eight or nine prescriptions for hydrocodone, Duragesic patches,
and another drug from February to May. Schenk told him that Boyer had come to
the pharmacy, presented the Duragesic patch prescription, and obtained a
thirty-count prescription for Lortab.  In
light of what Schenk told him about the long-term care facility Francis was in,
he Arealized
that Mr. Boyer was probably obtaining these prescriptions by fraud.@ He
contacted APS, which had filled Francis=s
Duragesic patch prescription on May 14, and discovered that it was a dedicated
private pharmacy for long-term care facilities.[9]








Sergeant
Ball testified that he waited at United for a while to see if Boyer would come
back, but Boyer did not.  When he went
back to his office, he ran a background check on Boyer and discovered an
outstanding warrant for Boyer=s
arrest.  He confirmed the warrant and
then created a plan with two or three other agents Ato go
sit on the pharmacy and wait for Mr. Boyer to show up.@  They went back and waited around three hours,
but Boyer did not return. He advised pharmacy personnel to call him when Boyer
came back. 

When
Boyer returned to United on May 16 to pick up the Duragesic patches, Schenk
notified the DPS narcotics unit. 
Lieutenant Allen Navarro and Sergeant Jeff Ashburn responded.  Sergeant Ashburn testified that he and
Lieutenant Navarro went to United and arrested Boyer.  After arresting him, they performed a search
incident to arrest on Boyer and discovered a prescription pill bottle in
Francis=s name,
admitted in evidence as State=s
Exhibit 3.

Schenk
testified that State=s Exhibit 3 was a pharmacy
bottle filled at United for Francis with a prescription number that
corresponded with the thirty-count generic Lortab (hydrocodone) filled on May
14, 2007.  The pill bottle contained four
pills.  The prescription itself called
for one pill every four to six hours.  In
light of these dosing instructions, Schenk responded, ANo,@ when
asked whether someone should take twenty-seven of the thirty pills in
forty-eight hours.[10]








Of the
four pills (State=s Exhibits 4A and 4B) in the
pill bottle, one was a Watson 349 Dihydrocodeinone dosage unit and another was
a dosage unit of Dihydrocodeinone marked M358. 
Dihydrocodeinone is a derivative of hydrocodone.  Sergeant Ashburn explained that Watson 349
dosage units contain five milligrams of Dihydrocodeinone with 500 milligrams of
Acetaminophen, while M358 contains 7.5 milligrams of Dihydrocodeinone along
with 500 milligrams of Acetaminophen. 
Schenk testified that the hydrocodone Francis was typically prescribed,
at least since January 1, 2007, was for 5/500s, Anot
7.5s.@  The parties stipulated to the DPS drug
analysis lab report, which stated that the pills contained Dihydrocodeinone.








Lieutenant
Navarro testified that he called Long Meadow and spoke with Paro on May 16, the
date of Boyer=s arrest.  He never spoke to Francis.  Paro stated that Long Meadow has a contract
with APS for its residents=
medications; that, for the residents= safety,
they do not accept outside medication (i.e., avoiding duplication of doses);
and that Long Meadow requires a doctor=s order
before it will accept medication through outside prescriptions. However, he
acknowledged on cross-examination that relatives are not searched for outside
medicine when they visit, and he acknowledged that his records did not state
that Boyer was told not to give his mother medication.  On redirect, he testified that it would have
been dangerous and potentially lethal for Francis to receive outside medication
in addition to the same medication she was receiving at Long Meadow and gave
the following testimony:

Q.  Now, had somebody put
another [Duragesic] patch on [Francis] after she had already been given a patch
by the nurse, would the nursing staff have noticed?

 

A.  We monitor the site where we=ve put the patch.

 

Q.  Uh-huh.  And so if somebody put it on the other arm
and there was already one on the other arm or wherever you place it, would that
be noted in the charts and somebody been made aware it=s twice the dosage?

 

A.  Yes.

 

Q.  And was that indicated
anywhere in the medical records?

 

A.  No, ma=am. 

Glen
stated that no one at Long Meadow ever told him not to bring his mother any
outside medication and that he did not know whether she ever received any
outside medication.  He stated that he
never saw anyone bring medicine in. 








Sergeant
Ball testified that Duragesic patches go for between $50 and $100 each Aon the
street.@  He testified that hydrocodone (Lortab)Cin his
opinion, the most widely abused prescription drug on the streetChas a
street value from $3 to $5 per pill, and the street value of a single
antianxiety pill could be up to $1 or $2.

D.  Sufficiency Analysis

Boyer
states that his appeal=s focus is on the legal and
factual insufficiency of the evidence to support the jury=s
finding that he used misrepresentation, fraud, deception, or subterfuge in
securing the prescription medication.  He
argues that it is clear Athat no rational trier of fact
could find that [he] acted in such a way and therefore was criminally liable
for picking up his mother=s medications[,] [s]omething he
had done with the knowledge of a doctor, a pharmacist, and the patient for a
number of years.@ 
In support of his argument, he relies on testimony of Dr. Ozier, Schenk,
and Boyer=s brother that they did not know
Francis=s
facility would not allow outside medications and that A[n]owhere
in Francis Boyer=s medical chart from the
facility was it noted that outside meds were not allowed or that Mark Boyer was
told of such a policy.@ 
He further argues that A[t]o
misrepresent facts[,] one has to know of their existence,@ and he
complains that the State never bothered to interview Francis about this while
she was alive.       

1.  Legal Sufficiency:  Counts One and Two     








The record
reflects that Dr. Ozier issued a triplicate prescription in Francis=s name for twelve
Duragesic patches containing Fentanyl and that Boyer attempted to obtain them
by presenting that prescription at United and attempting to get it filled on
May 14.  And the evidence shows that Dr.
Ozier issued a prescription in Francis=s name for Lortab
and that Boyer filled the prescription at United on May 14.  This occurred while Francis was already
receiving the same medications through Long Meadow and had been receiving them
there for some time.








With
regard to Boyer=s mens rea challenge, we observe
that the standard of review is the same for direct and circumstantial evidence
cases; circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor.  Clayton,
235 S.W.3d at 778; Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App.
2007).  In determining the
legal sufficiency of the evidence to show an appellant=s
intent, and faced with a record that supports conflicting inferences, we Amust
presumeCeven if
it does not affirmatively appear in the recordCthat the
trier of fact resolved any such conflict in favor of the prosecution, and must
defer to that resolution.@ 
Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).  Based on testimony about Boyer=s
possession of a thirty-count pill bottle in Francis=s name
with only four remaining pills (one of which was not a Lortab 5/500 but rather
Dihydrocodeinone in a higher dosage),[11]
when he filled the prescription only two days before, as well as testimony that
Long Meadow was giving Francis her prescription medications directly, we
conclude that a rational trier of fact could have found that Boyer possessed
the intent necessary for conviction on both counts.  Therefore, viewing all of the evidence in the
light most favorable to the prosecution, we conclude that the evidence was legally
sufficient to convict Boyer on counts one and two.  We overrule Boyer=s third
issue.  

2.  Factual Sufficiency: Counts One and Two








In
addition to the evidence discussed above, the jury also saw the sheer number of
prescriptions for Lortab and Duragesic patches that Boyer filled under Francis=s name
from January to May.  It could have noted
the contrast between the frequency that he filled these prescriptions and how
often he filled Francis=s heart medication, AmiodaroneCthat is,
once, on January 8, 2007, for thirty pillsCwhen she
was supposed to take Amiodarone every day. 
The jury heard Dr. Ozier affirm that it was important for either the
patient=s familyCthat is,
the patient=s primary caregiver, in this
case, BoyerCor the long-term facility to let
the treating physician know about how the patient would be receiving
medication.  And since Boyer was Francis=s
primary caregiver, the jury could have decided that Boyer had the
responsibility to notify Long Meadow about Francis=s
prescriptions and to notify Dr. Ozier and United about Francis=s
relocation to Long Meadow.  Because their
testimonies indicate that he did not, the jury could have concluded that he
decided to take advantage of the situation instead.  








Additionally,
although Paro testified that relatives are not searched for outside medicine
and acknowledged that his records did not state that Boyer was told not to give
his mother medication, he also testified that the Long Meadow nursing staff
would have noticed if someone had put another Duragesic patch on Francis beyond
what she had been prescribed at the facility. 
He testified that it would have been dangerous and potentially lethal if
someone had dosed Francis with outside medication in addition to what she was
already receiving.  As Francis did not
die until a year later, when Boyer had already been arrested, the jury could
have concluded that Boyer was not delivering to Francis the outside medications
that he collected using her prescriptionsCthat is,
that he was misrepresenting to Dr. Ozier and United that he was actually
delivering the medicines to Francis.  And
Glen testified that he never saw anyone bring medicine in.  Viewing all of the evidence in a neutral
light, we conclude that the evidence supporting the conviction is not so weak
that the jury=s determination is clearly wrong
and manifestly unjust or that conflicting evidence so greatly outweighs the
evidence supporting the conviction that the jury=s
determination is manifestly unjust.  See
Steadman, 280 S.W.3d at 246; Watson, 204 S.W.3d at 414B15,
417.  Therefore, we hold that the
evidence is also factually sufficient to support Boyer=s
convictions on counts one and two, and we overrule his fourth issue.

IV. 
Conclusion

Having
overruled all of Boyer=s issues, we affirm the trial
court=s
judgment.

 

PER
CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and MEIER, J.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED:  August 31, 2010











[1]See Tex. R. App. P. 47.4.





[2]Specifically, one count
of attempting to possess a controlled substance by misrepresentation, fraud,
deception, or subterfuge by presenting a triplicate prescription in the name of
Francis Boyer (his mother) for twelve Duragesic patches, and one count of
possessing or obtaining a controlled substance by misrepresentation, fraud,
deception, or subterfuge by receiving thirty dosage units of hydrocodone in the
name of Francis Boyer.  Boyer pleaded
true to two enhancement paragraphs, a felony
possession-of-a-controlled-substance-with-intent-to-deliver offense and a
felony offense of delivery of a controlled substance.





[3]Because Boyer challenges
the legal and factual sufficiency of the evidence to support his conviction in
his third and fourth issues, we will delve into the facts in conjunction with
our analysis of those issues below.





[4]During final arguments at
the hearing, Boyer=s counsel acknowledged,

 

These inmatesCpeople who are held on
parole warrants, they are put in a Catch-22 because we can=tCan examining trial, a 90
day motion to get a PR bond does no good. 
We can=t force a speedy
indictment because they=ve got a parole hold and
no one ever does anything.  And so they
just sit here.

 





[5]An email from Harris to
the State, dated April 22, 2008, indicates that a plea offer was Aon the table.@





[6]A Ablue warrant@ is an arrest warrant
issued when a parolee has been suspected of violating the conditions of his
parole.  See Blaylock, 259 S.W.3d
at 209 n.2.





[7]Many of the witnesses
used the trade and generic names of these drugs interchangeably.  For clarity, we will refer to these drugs by
their trade names: Duragesic patches, Lortab, Ativan.





[8]A Apatient profile@ is the list of
medications that a patient develops over the course of doing business with a
pharmacy.





[9]Sergeant Ball testified
that long-term care facilities have dedicated private pharmaciesCpharmacies not open to
the publicCfill their prescriptions
to have control over the prescriptions and that this is a common practice.  AThey know they=reCthey=re getting all their medications from that one
pharmacy so they don=t have 50 family members
bringing in prescriptions for all the family members.@  Schenk stated that most nursing homes use one
pharmacy.





[10]Sergeant Ball testified
that the officers were advised that someone had stolen Francis=s medication while Boyer
was asleep but that they had not received this information prior to May 16 and
Boyer=s arrest. 





[11]When asked how a
prescription is filled, Schenk testified that pills are transferred from large
containers, containing 500 to 1,000 pills, to the small thirty-count bottles
and that their tech counts the pills the first time and then a pharmacist
counts them Aon the controllers for
the amount that is on the prescription.@