ACCEPTED
13-15-00145-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
12/14/2015 11:58:52 PM
Dorian E. Ramirez
CLERK

## No. 13-15-00145-CR

IN THE

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS

THIRTEENTH COURT OF APPEALS DISTRICT

11:58:52 PM

DORIAN E. RAMIREZ
Clerk

OF TEXAS

CORPUS CHRISTI, TEXAS

**JESUS RIVERA**
Appellant

**v.**

**STATE OF TEXAS**,
Appellee

TRIAL CAUSE NO. 2013-CR-1573
APPEAL FROM 144TH DISTRICT COURT
BEXAR COUNTY, TEXAS
HONORABLE LORINA RUMMEL, JUDGE PRESIDING

## **APPELLANT'S BRIEF**

ORAL ARGUMENT REQUESTED

**ANGELA J. MOORE**
**310 S. St. Mary's, suite 1830**
**San Antonio, Texas 78205**
**210-227-4450 office**
**210-364-0013 cell**
**Amoorelaw2014@gmail com**
**SBN 14320110**
**ATTORNEY FOR APPELLANT**

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1(a) (2005), the parties to this suit are as follows:

(1)    **JESUS RIVERA**, TDCJ #01986518, Telford Unit, 3899 Hwy 98, New Boston, Texas 75570, is the Appellant and was the defendant in the trial court.

(2)    The **STATE OF TEXAS**, by and through the Bexar County District Attorney's Office, Paul Elizondo Tower, 101 W. Nueva ST., 4th floor, San Antonio, Texas 78205, is the Appellee and prosecuted this case in the trial court.

The trial attorneys were as follows:

(1) APPELLANT was represented by **JOE STENBERG,** sbn# 19142800**,** 722 E. Euclid Ave., San Antonio, Texas 78212.

(2) The State of Texas was represented by **SUSAN D. REED,** District Attorney, and Christopher Karl**,** sbn# 24070035 Assistant District Attorney, Paul Elizondo Tower, 101 W. Nueva ST., 4th floor, San Antonio, Texas 78205.  The appellate attorneys are as follows:

(1) Jesus Rivera is represented by **ANGELA J. MOORE, SBN #14320110**, Tower Life Building, 310 S. St. Mary's Street, Suite 1830, San Antonio, Texas 78205.

(2) **SUSAN D. REED**, District Attorney, and the District Attorney's Office, Appellate Division, San Antonio, Texas 78205, represent the State of Texas.

The trial judge was **Hon. Lorina Rummel**, 144th District Court, 300 Dolorosa St., 3rd Floor, San Antonio, Texas 78205.

# Table of Contents

Identity of Parties and Counsel.................................................................. ii

Table of Contents ...................................................................................iv

Table of Authorities ..................................................................................v

I.  STATEMENT OF THE CASE ...............................................................1

II. STATEMENT REGARDING ORAL ARGUMENT ..............................2

III.  SOLE ISSUE PRESENTED ..............................................................3

The evidence was legally insufficient that Appellant committed murder, since the State did not refute beyond a reasonable doubt, Appellant's evidence of self-defense, thus requiring that his conviction be reversed and that the court render a judgment of acquittal. ...........3

IV. STATEMENT OF FACTS ....................................................................3

V. SUMMARY OF THE ARGUMENTS....................................................17

VI. ARGUMENT AND AUTHORITIES ..................................................18

APPELLANT'S SOLE ISSUE: ............................................................18

Conclusion and Prayer........................................................................32

Certificate of Service...........................................................................34

# Table of Authorities

**Cases**

*Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App. 2010) ...................18

*Brundy v. State*, 280 S. W.3d 425, 433 (Tex.App.-Fort Worth 2009, pet ref'd) ........................................................................................................19

*Davis v. State,* 104.W.3d 177, 181 (Tex.App.-Waco 2003, no pet.) .........30

*Davis v. United States*, 160 U.S. 469 (1895) ..........................................31

*Ferrel v. State,* 16 S.W.3d 861, 865 (Tex.App.-Houston [14th Dist] 2000), rev'd on other grounds, 55 S.W.3d 586 (Tex.Crim.App. 2001) ............29

*Hernandez v. State,* 309 S. W.3d 661,665 (Tex.App.-Houston [14th Dist] 2010, pet ref'd) ........................................................................................20

*Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App. 1997) ....................18

*Meraz v.* State, 785 S.W.2d 146, 154-155 (Tex. Crim.App. 1990) ...........19

*Miller v. State,* 177S.W.3d 177, 183 (Tex.App.-Houston [1st Dist] 2005, pet ref'd) ..................................................................................................29

*Naasz v. State,* 974 S.W.2d 418, 421 (Tex.App.-Dallas 1998, pet ref'd) .19

*Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App. 1991) ............20, 30

*Steadman v. State*, 280 S.W.3d 242, 246 (Tex.Crim.App. 2009) ......20, 21

*Watson v. State,* 204 S.W.3d 404, 414 (Tex.Crim.App. 2006) ...........20, 21

*Zuliani v. State,* 97 S.W.3d 589, 593-594 (Tex. rim.App. 2003) .19, 20, 30

**Statutes**

TEX. CODE CRIM. PROC § 26.04 ........................................................................1

TEX. PEN. CODE §19.02 (b)(1) ........................................................................1

TEX. PEN. CODE 19.02(b)(2) ..........................................................................1

TEX. PENAL CODE § 1.07(42) .......................................................................30

TEX. PENAL CODE § 1.07(a)(42) ...................................................................31

TEX. PENAL CODE § 9.01(3) .........................................................................31

TEX. PENAL CODE § 9.31 ..............................................................................28

TEX. PENAL CODE § 9.32, 9.33 .....................................................................31

TEX. PENAL CODE § 9.32(a) ..........................................................................29

TEX. PENAL CODE, § 9.32 .............................................................................30

**Other Authorities**

https://www.whitehouse.gov/ondcp/ondcp-fact-sheets/synthetic-drugs-
k2-spice-bath-salts .......................................................................................22

TO THE HONORABLE COURT OF APPEALS:

COMES NOW, Jesus Rivera, Appellant, by and through his attorney of record, Angela J. Moore, and pursuant to the provisions of TEX. APP. P. 38, et seq., files this brief on appeal. This is an appeal from a conviction for Murder.

## I. STATEMENT OF THE CASE

Jesus Rivera will be referred to as "Appellant" or "Rivera" and by male pronouns. The State of Texas will be referred to as the "State." On February 20, 2013, by a two-count Indictment, Rivera was charged with: Count I – Murder of Ryan Yearley by shooting him with a deadly weapon that is, a firearm. TEX. PEN. CODE §19.02 (b)(1) - 1st Degree Felony; Count II -Murder, with intent to cause serious bodily injury to Ryan Yearley did commit an act clearly dangerous to human life that caused the death of Ryan Yearly by shooting the complainant with a deadly weapon, namely, a firearm.  TEX. PEN. CODE 19.02(b)(2) – 1st degree felony. (1 CR 6).   A timely notice of appeal was filed on March 5, 2015, and pursuant to TEX. CODE CRIM. PROC § 26.04, Attorney Angela J. Moore was appointed as part of the public defender office. (CR

1

1: 145).[1] Appellant filed a motion to suppress. (CR: 20-22). The Motion was granted. (8 RR 3).

At trial, on February 10, 2015, Appellant pleaded not guilty. (4 RR 40). After hearing the evidence, the jury found Appellant guilty as alleged in Count I of the indictment of Murder. (CR: 143; 13 RR 136). The jury assessed punishment at 66 years' incarceration in the Texas Department of Corrections, Institutional Division. (CR: 143; 13 RR 138). On March 5, 2015, defense counsel filed a timely notice of appeal for Appellant. (CR: 145). This brief follows.

## II. STATEMENT REGARDING ORAL ARGUMENT

Defendant requests oral argument because it would assist the court in the decisional process because its decision requires the application of law to the facts of the case.

---

[1] The public defender ran out of funding for this part time position, and in the interest of due process for the accused, Ms. Moore was continued on the case as court appointed counsel.

## III.  SOLE ISSUE PRESENTED

**The evidence was legally insufficient that Appellant committed murder, since the State did not refute beyond a reasonable doubt, Appellant's evidence of self-defense, thus requiring that his conviction be reversed and that the court render a judgment of acquittal.**

## IV. STATEMENT OF FACTS

### A.  STATEMENT OF FACTS

In August of 2012, Jesus Rivera, Maria Rivera, Ryan Yearling, and Jeffrey Yearling moved into 2026 Delgado St. in San Antonio, Texas.  Jesus would live in the "back house", and Maria, Ryan and Jeffrey would occupy the main house on the lot.  The house was owned by Jesus' and Maria's father (9 RR 31). At that point, Ryan and Maria had been living together since 2010, first in their own apartment, and then with Maria's aunt Diana (4 RR 121).

Even before moving into the Delgado house, Ryan and Maria's relationship was marred by domestic violence, drug abuse, criminal charges, eviction, and a failed pregnancy. After moving into the Delgado house, a culture of drug use was quickly established. Jesus, Ryan, their friends and neighbors would regularly smoke "Klimax", a popular brand of synthetic marijuana (4 RR 149), and testimony indicates they were

3

also indulging in cocaine, methamphetamine, marijuana, heroine, and alcohol. (4 RR 149-151).

In the early hours of November 22, 2012, Thanksgiving day, Ryan Yearling was killed by a shotgun blast to the chest, a shooting to which Jesus Rivera admitted, but asserts was committed in self defense as a drug addled, knife wielding Ryan attacked him first. Both Maria Rivera and Jose Torres claim that they were conscripted to help Jesus move the body from the living room of the main house to the bathtub of the back house, where police discovered it several hours later after a warrantless entry. A toxicology report – the contents of which were communicated to the jury by expert witness Dr. Kimberly Molina, Deputy Chief Medical Examiner with the Bexar County Medical Examiner's Office – showed that two different types of synthetic cannabinoids were present in the deceased. (6 RR 152).

Marilyn Yearley-Perez is a nurse and the mother of the deceased. The morning after the shooting- and before she had any reason to know something was wrong - she called to speak with Ryan, and Maria told her that he was not there. (4 RR 76). After Marilyn pried as to Ryan's whereabouts, Maria told her that he had left the night before at around

4

10:00. (4 RR 76, 77). Marilyn testified that this did not sound right to her, and she went over to the house to pick up Maria as originally planned. ( 4 RR 77). After greeting the baby, she saw Jesus sitting on the couch watching television (4 RR 78). She testified that she asked Jesus where Ryan was and Jesus told her that he didn't see him leave. (Id.) After searching the house for Ryan, she eventually gave up and took Maria and Jeffrey to her mother-in-law's house for two-and-a-half hours. (4 RR 81). She then took Maria and Jeffrey back to the Delgado house and found Jesus and Mr. (Roberto) Rivera watching TV. (4 RR 82). Marilyn testified that the situation at the house was "all quiet and nice." (Id.) Marilyn asked Roberto (father of Jesus and Maria) if he knew where Ryan was, and Roberto said he thought he was with Marilyn, Jesus and Maria. (4 RR 82). Marilyn testified that Maria told the same story about Ryan leaving the house abruptly the night before. (4 RR 82, 83). At that point it was nearly 3:00 and she was getting concerned. (4 RR 83). Marilyn testified that she called the jail to see if Ryan had been arrested, but that it didn't occur to her to call any hospitals. (4 RR 84). She testified that she found this ironic because she

was a nurse. (Id).  She then left to check on her husband, intending to return to the Delgado house to file a missing persons report. (Id.)

When she returned, she pulled up to the house at the same time as the police. (4 RR 85). Marilyn testified that she and the officers approached Maria at the same time, and that Maria was looking at the officer but would not look at her. (4 RR 86).  She heard Maria communicate Ryan's death to the officer.  Robert Rivera told her that the body was in the garage apartment. (4 RR 88).  Marilyn testified that her reaction was one of disbelief, and that she was rendered numb, and while she was waiting for her husband to arrive, she noticed a crowd of San Antonio Police Officers had gathered by the driveway with their guns drawn. (4 RR 89).  Marilyn watched an officer kick the door of the back house in, and radio that he had found a body. (4 RR 88). The officers then advanced to the main house and entered it as well. (Id.) Marilyn testified that she got no answers from Maria, and did not see Jesus again (4 RR 89).  During cross-examination, Marilyn testified that the windows of the garage apartment were spray painted black and one could not see inside. (4 RR 98).  Marilyn testified that when she was first in the main house that day and noticed a piece of carpet missing,

6

Maria told her that she had to cut a piece out because she could not remove a chocolate milk stain. (4 RR 101).

Marilyn testified that Ryan had mentioned buying a new knife recently that he was excited about. (4 RR 103). She testified she was aware that Maria wanted to break up with Ryan, but that Ryan expressed interest in making things work. (Id.) She testified that she saw Maria everyday, but that she had not spoken with Jesus at all. (4 RR 105).

Maria Rivera testified that the house had been broken into during the month of November while she was home alone with the baby. The break-in made Maria feel unsafe, and she testified that Ryan tried to buy a gun – he went as far as paying a deposit for a firearm at a pawnshop before being denied the weapon because he was on probation –to defend the home from intruders (8 RR 73, 74). Ryan's mother – Marilyn Yearley-Perez - also recalled Ryan telling her he wanted a handgun. (4 RR 147). Roberto Rivera, the father of Jesus and Maria, testified that, on November 21, 2012, mere days after Ryan's failed background check disallowed him from purchasing a gun, he (Jesus) wanted to buy a gun himself. (9 RR 76, 77). Roberto was aware that

7

Maria, Ryan and Jesus were concerned about a recent burglary at the house that Maria ("Lupita") reported to the police. (9 RR 82). Roberto testified that "[he] understood them wanting to get a gun." (9 RR 82). Roberto testified that if they were going to buy a gun, he wanted them to buy the gun legally, and suggested Academy Sporting Goods. (9 RR 79). Christopher Garza, an Academy employee who showed Jesus the guns testified that, when asked why he wanted a gun, Jesus replied, "home defense." (9 RR 8). Jesus was shown (and would ultimately buy) the gun that Garza referred to as Academy's "cheapest gun for home defense." (9 RR 8). Jose "Frijol" Torres, a friend of both Jesus and Ryan, testified that Jesus bought the shotgun "only for safety." (7 RR 18). Jesus himself testified that the gun was purchased for "protection in the house." (9 RR 135). Because Ryan was unable to buy the handgun from the pawnshop, Jesus testified that he felt obligated to purchase a firearm. (Id.)

Officer Nick Cucinotta of the San Antonio Police Department was the first officer on the scene. He received a dispatch at 3:00 pm on November 22, 2012, for a disturbance or a missing person. (4 RR 161). At the time of his arrival, he thought he was responding to a missing

person report. (4 RR 163, 164). Officer Cucinotta told the jury that when he first spoke with Marilyn, she explained that she wasn't initially worried because she thought Ryan had gotten drunk and passed out somewhere. (4 RR 167). Officer Cucinotta stated that Maria began sobbing and told him that Ryan was dead. Maria told Officer Cucinotta that her brother shot Ryan and that her brother, Jesus, was still in the house, and that she was worried because her baby was in the house as well with Jesus. (4 RR 169, 172). Officer Cucinotta testified that Maria told him the body was in the garage apartment. (Id.) Officer Cuinotta testified that it was unclear if Jesus was armed at the time. (Id.) He and other officers went into the main house and only found the baby (4 RR 172).

Cucinotta and Officer Jesse Avalos kicked in the door of the back house (garage apartment) and made entry. (4 RR 174). Officer Cucinotta testified that they found a body with a pale white foot sticking out of the tub, and the rest of the body was covered by a gutted mattress. (4 RR 175). As soon as he saw the body in the bathroom, Officer Cucinotta approached it and touched one of the feet. He testified

that the foot was cold, and made him realize the body was lifeless. (4 RR 177).

Officer Cucinotta claimed he only did a "quick search" and once he found the body, he did not move the mattress cover off the body. (4 RR 180.) He claimed he did not locate any weapons in the back house. (Id.) Officer Cucinotta testified that he and the other officer backed out as that point. He was not the main reporting officer and that he just happened to be the first one there. (4 RR 180, 181).

After being shown a "consent to search" form with his signature, SX 22, Detective Cucinotta was asked why he would obtain such a document. He responded: "Normally we will do that to get access to the home, get better access. I guess after we did the consent, then we probably went in afterward. Once you get consent, it's almost like a – without getting a warrant. As long as we get somebody's consent to go in, you don't need the warrant." (4 RR 179). It appears the consent was obtained after the body was determined to be lifeless. (4 RR 180).

Officer Ruben Moncivaiz, Jr. of the San Antonio Police Department is an officer in the Problem Oriented Policing Unit, a "specialized unit...in troubled areas of the city [which] deals with

gangbangers, drugs, all the high crime rates that you see on TV." (4 RR 184). Officer Moncivaiz testified that after Maria told him that Ryan was in the back, he "didn't know if – if the individual needed medical attention or anything. So, due to "exigent circumstances," Officer Cucinotta kicked in the door. (4 RR 188). After they realized that the body was lifeless, according to Officer Moncivaiz testimony, they regrouped outside and decided that because Jesus could be in the main house with a child, they needed to go in there as well. (4 RR 189). Officer Moncivaiz testified that they found Jeffrey, the baby, in a car seat on top of a bed, but did not find Jesus. (4 RR 192).

Officer Moncivaiz testified that Maria "came up with the idea" of rolling the body up in discarded carpet (4 RR 195), but that she had done so because she was scared of Jesus (Id.) Jose Frijol Torres had helped her move the body to the back house.(4 RR196). The main house was cleared, and he returned to the entry of the back house and kept track of the officers that entered. (4 RR 192). Moncivaiz ran Jose "Frijol" Torres, and went looking for him, and found Jose, on November 24, 2012. Jose Torres gave the officer his name which matched the accomplice in the murder. (4 RR 198).

11

Attorney Cathy Compton puts on the record that her client, Jose "Frijol" Torres had signed an agreement with the State granting immunity, and that agreement is marked as State's exhibit 93. (7 RR 3). Ms. Compton stated that she drafted the immunity agreement and that she went over it with her client in both English and Spanish. (Id.)[2]

Jose "Frijol" Torres was a dishwasher who lives with his mother in Castroville, Texas. (7 RR 8). Jose testified that he has information about what happened on Thanksgiving of 2012, and that he spoke with police after the incident. (7 RR 8,9). Jose acknowledged that he reached an agreement with the State. (7 RR 10). Jose acknowledged that the nature of the agreement was that if he testified "truthfully and fully" the State would not prosecute him. Jose explained that he was a friend of Jesus Rivera, that he had known him for about four years, and that he also knew Maria Rivera and knew Ryan Yearley. (7 RR 12). Jose testified that he lived in the back house with Jesus for about four months. (7 RR 13). Jose and Jesus "worked and smoked" together. (7 RR 15). Jose testified that he was at the Delgado house on the night before Thanksgiving, 2012. (7 RR 16, 17). Jose was at the house with

_____

[2] Inexplicably, defense counsel did not raise or discuss an accomplice witness charge.

Ryan and Maria while Jesus was at Academy with Roberto Rivera buying the gun. Jose testified that Jesus bought the gun, "only for safety" (7 RR 18), particularly from gang members that assaulted him. Jose did not like the fact that there was a gun in the house. Jose explained that even though he was nervous, he didn't think that anything bad was going to happen that very night. (7 RR 26). When he left, everything was calm. (7 RR 26). Jose testified that Jesus called at around 7:00 or 7:30 on Thanksgiving morning, letting him know something bad had happened. (7 RR 22). Jose returned to the Delgado house at 8:30 or 9:00 on Thanksgiving morning (7 RR 28). Jose testified that Jesus was sitting on the couch with the shotgun and told him to go look in the bathroom, and when Jose did, he saw Ryan's dead body. (7 RR 29-30). Jose stated that he asked Jesus what was going to happen with the body, and that Jesus said no one has to know and that they needed to bury the body. (7 RR 31).

Jose testified that it was his decision to bury the body (though they never actually did), because they had always been friends and were there for each other. He also told the jury that he helped because he was afraid. (7 RR 32). While Jose and Jesus were having this

13

exchange, Maria was in her room with the baby, crying. (7 RR 34). Jose testified that they put Ryan in the hollowed out mattress and carried him to the back house, and put him in the tub. (7 RR 34). Jose testified that that Jesus said he would make him disappear, and that he said the same to Maria (7 RR 35). After putting the deceased in the bathtub, they went back to the house, smoked and played games. (7 RR 35). Jose testified that Jesus never told him that Ryan had come at him with a knife. Jose stated that Ryan would always bother Jesus. (7 RR 36). During cross-examination, Jose testified about an incident during which Jesus cut Jose's hand with a knife, stating the cutting was accidental. (7 RR 43). Jesus took him to the hospital, and apologized profusely immediately after it happened. Jose testified that Ryan took 4 or 5 Xanax while Jesus was at Academy Sporting Goods with his father Roberto. (7 RR 44, 45). According to Jose, Ryan had also snorted heroin that evening. (Id.) Jose and Ryan were on the patio smoking a blunt when Jesus arrived. (7 RR 46). While Jose was at the house, Ryan and Jesus were getting along fine. (7 RR 47). Jesus left with his father and they were gone for a while. When he returned he was carrying the box with the new shotgun inside. (7 RR 49). Jose testified that by the time

Jesus got back with the new shotgun, Ryan was "all drugged up." (7 RR 50). It was at that time that Ryan called Jose "Nigger," and told him to leave. (Id.) Jose testified that Ryan was belligerent and looking for a fight, but Jose didn't want to have anything to do with it. Ryan was the type that who thought he could beat up anyone, because Ryan was a big guy. (7 RR 51). Jesus Rivera, Appellant, was only five foot one and weighed 110 pounds. (4 RR 57). Jose admitted that he took the path of least resistance with the police by giving them the answers they were looking for. (7 RR 52). This was why Jose initially told the police that Jesus come up with the idea of burying Ryan, but he was just trying to appease the officers. (7 RR 52). Jesus required Jose's assistance in carrying the rolled up carpet, because Jesus could barely lift his end. (4 RR 57).

Officer Scott Marshal, San Antonio Police Department, testified that upon entry into the back house, he observed both a foot sticking out of the tub, and a gun sticking out from under a blanket. (4 RR 211). Officer Marshal testified that he contacted the Medical Examiner's Office. He added that "It appears that [the gun] could have been trying

15

to be hidden from (sic)...." before being objected to on the basis that it required speculation. (4 RR 214).

Officer Arturo Rodriguez of the SAPD Gang Unit testified that he and his partner were dispatched to 814 Calaveras. They arrived at a Thanksgiving celebration with Barbeque and beer. Jesus Rivera emerged from the crowd with his hands up. (4 RR 237). Jesus Rivera was cooperative during the arrest and told the officers where he left the shotgun (4 RR 238).

Crime Scene Investigator Scott Coonradt testified that once a warrant was obtained, they went to the Delgado House to collect evidence. (5 RR 87). Investigator Coonradt identified State's exhibit 35, which is swab of what appeared to be blood. It was marked by him as E1 and was taken from the bathroom floor next to the bathtub (5 RR 93-94). Investigator Coonradt stated that all evidence "on or around" the body gets collected as evidence, but if it is in the body, it must be retrieved by the Medical Examiner's Office. Indeed, the photos presented by the officer depict a person from the Medical Examiner's officer inspecting the body. (5 RR 105, et. seq.).

Catherine Haskins-Miller is a forensic scientist in the Serology and DNA section of the Bexar County Criminal Investigation Laboratory. Haskins-Miller testified that her job is to take in physical evidence and examine it for the presence of biological fluids, such as blood, semen or saliva. (6 RR 113). If she is able to identify a stain, it can be retained and a DNA analysis can be performed. (6 RR 113). Haskins-Miller testified that there was not enough human DNA on Ryan's knife to create a genetic profile. (6 RR 118).

## V. SUMMARY OF THE ARGUMENTS

The greater weight and preponderance of the credible evidence herein shows that [Rivera] acted in self-defense from the apparent danger created by the attack of Ryan Yearley, so that it is manifestly unjust that he was convicted of manslaughter. The unfortunate death of Ryan arose from an attack upon Jesus Rivera by his dear friend, his brother by friendship, due to the assailant's apparent threat of stabbing Rivera, not from any act that the law justified Rivera in using to protect himself. The jury's verdict to the contrary is, therefore, against the great weight of the evidence. Jesus Rivera was entitled to a verdict of not guilty as his acts were clearly in the defense of himself.

Consequently, the jury's rejection of Appellant's justification of self-defense and the jury's subsequent verdict was not rational. Accordingly, this Court should, as it must, enter an order reversing the judgment entered in the court below and thereafter enter a judgment of acquittal.

## VI. ARGUMENT AND AUTHORITIES

**APPELLANT'S SOLE ISSUE:**

**The evidence was legally insufficient that Appellant committed murder, since the State did not refute beyond a reasonable doubt, Appellant's evidence of self-defense, thus requiring that his conviction be reversed and that the court render a judgment of acquittal.**

A.    Standard of Review:

In reviewing the legal sufficiency of evidence, all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the offense charged beyond a reasonable doubt. *Brooks v. State* 323 S.W.3d 893, 912 (Tex.Crim.App. 2010). Legal sufficiency review focuses on the quality of the **evidence presented.** *Brooks*, 323 S.W.3d at 917-918 (Cochran, J., concurring). Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).

18

Because self-defense is classified as a defense rather than an affirmative defense, a factual sufficiency review is used generally to review an appellate factual sufficiency challenge to the jury's implicit finding against a self defense claim. *Brundy v. State*, 280 S. W.3d 425, 433 (Tex.App.-Fort Worth 2009, pet ref'd). When a criminal defendant seeks review of a jury's failure to make a finding on which he has a burden of proof, the appellate Court's factual review jurisdiction is invoked. *Naasz v. State*, 974 S.W.2d 418, 421 (Tex.App.-Dallas 1998, pet ref'd), citing *Meraz v. State,* 785 S.W.2d 146, 154-155 (Tex. Crim.App. 1990). In that instance, the reviewing court reviews all of the evidence in a neutral light and asks whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Zuliani v. State*, 97 S.W.3d 589, 593-594 (Tex. rim.App. 2003). Therefore, an appellate court may sustain a defendant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict

is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased.

When a defendant asserts a claim of self-defense, the State has the ultimate burden of persuasion. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App. 2003). When reviewing the sufficiency of the evidence concerning the jury's rejection of self-defense, the reviewing court looks to whether any rational jury could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910k, 914 (Tex.Crim.App. 1991); *Hernandez v. State*, 309 S.W.3d 661,665 (Tex.App.-Houston [14th Dist] 2010, pet ref'd).

All the evidence is viewed in a neutral light, favoring neither party, when reviewing the factual sufficiency of the evidence to support a conviction. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex.Crim.App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex.Crim.App. 2006). The reviewing Court then asks whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact finder's determination is

manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414-415, 417. Reversal is warranted where some objective basis in the record supports a determination that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

B. Facts supporting self defense

While Jesus and Ryan were close friends, a bond testified to by Marilyn Yearly (4 RR 123), and Maria Rivera (7 RR 103). Maria Rivera testified that, by November of that year, her relationship with Ryan had deteriorated to the point that a separation seemed inevitable, and they drafted a written agreement intended to govern custody of Jeffrey once Ryan moved out. Maria testified that Ryan's drug habit and proclivity toward erratic - and often violent - behavior while on drugs precipitated the pending separation. (7 RR 148; 8 RR 16-25).

Maria testified that Ryan had physically abused her (8 RR 16) flipped over furniture (8 RR 29), and punched holes in the wall of their old apartment (8 RR 117). Others also testified that Ryan had a tendency to become violent and aggressive when on drugs. Hector "Guero" Hernandez, their neighbor across the street, testified that Ryan

21

would get aggressive, had been aggressive with him, personally, and "thought he was invincible." (8 RR 125). Hector said that Ryan tried to force him to fight, and that he, Hector, walked away from the fight; (8 RR 125). Jose "Frijol" Torres testified that on the night Jesus purchased the shotgun at Academy, he, Ryan, and Jesus were smoking Klimax[3] and drinking beer on the back patio when Ryan called Jose a "Nigger" and told him to leave. (7 RR 50). Jose explained that Ryan always wanted to fight without provocation, and answered affirmatively when asked if Ryan was the kind of person "who thinks he can beat everyone up." (7 RR 51). Witnesses testify that Ryan smoked Klimax, drank beer, snorted cocaine, and popped Xanax the night Jesus purchased the shotgun (8 RR 118-119). In the early hours of the following morning, Ryan Yearling died of a shotgun wound to the chest. At trial, Jesus

---

[3] There are numerous references to "Klimax" in the record. It is understood from the record that Klimax is synthetic marijuana. Synthetic cannabinoids commonly known as synthetic marijuana, K2, spice are often sold in legal retail outlets as herbal incense or potpourri and synthetic cathinones are often sold as bath salts or jewelry cleaner. They are labeled not for human consumption to mask their intended purpose and avoid food and Drug Administration (FDA) regulatory oversight. Synthetic cathinones are man made chemicals related to amphetamines. Synthetic cathinone products often consist of methylenedioxypyrovalerone (MVPD), mephedrone, and methlone. See https://www.whitehouse.gov/ondcp/ondcp-fact-sheets/synthetic-drugs-k2-spice-bath-salts last accessed December 14, 2015.

Rivera admitted to shooting Ryan, but claimed he was attacked by Ryan, who was wielding a knife. (10 RR 51).

Maria Rivera was the girlfriend of Ryan Yearling, deceased, and the mother of his infant son, Jeffrey. At trial, she testified that she hid Ryan's favorite knife after the shooting because, if Ryan's mother were to see it in the house, she would not believe their story that Ryan had left unexpectedly. (8 RR 8). Maria says that she gave a statement to the police after Ryan's death. (Id.) During direct examination, Maria testified that Jesus told her before the shooting that he planned to kill Ryan. (7 RR During cross-examination defense counsel asks Maria whether, in her statement to the police, she claimed that Jesus never communicated such a plan, and her response was that she does not recall. (8 RR 11). Defense counsel asks Maria if, after she heard the bang of the shotgun, she knew who shot who, and her response is that she did not. (8 RR 12). When asked whether she had seen Ryan slash at people with his knife, she said she had seen him do that only once, and that she was mistaken when she said she saw him do that to "people." (8 RR 13). She testifies that while she and Ryan lived in Cypress Cove apartments, that he had a bad temper, that he broke the baby swing

23

out of anger, broke the door of the apartment, punched holes in the wall, and hit her several times. (8 RR 16). In addition, Ryan would take half the pain medication (Oxycontin) that Maria's doctor prescribed her after her miscarriage. (8 RR 15).) Ryan broke the baby's swing and the door at the apartment out of anger. (8 RR 16). She said that sometimes when Ryan would hit her, that she would hit him back, but that it did little good as he would strike her again. (8 RR 16).

Maria testified that while they lived at Cypress Cove, would take cocaine, and a mixture of Xanax and beer. (8 RR 17,18). She stated that the combination of Xanax and beer made Ryan think he was a "badass and could do anything to anybody." (8 RR 18). This particular combination of medication, according to Maria, caused Ryan to act very aggressive. (Id.) In fact, the couple had been evicted from their apartment due to police being called for Ryan's anger issues, and his arrest for drugs in the parking lot. (8 RR 26). Maria testified that on the night of the shooting, after Jesus had come home with the shotgun, Ryan came back from Hector Hernandez's house (across the street), and she could tell he had taken a combination of Xanax and beer. (8 RR 25). Maria testifies that Ryan drunkenly fought with Jose "Orlando" Torres,

24

but "doesn't recall" whether Orlando was cut by Ryan or if Ryan was drunk and on Xanax. (8 RR 39, 40). She also recalls an incident where Ryan had a seizure and they had to get their neighbor, Joseph "Chaparro" to help save Ryan's life. (8 RR 40-42). She initially answers in the affirmative when asked if the seizure was from a methamphetamine overdose (8 RR 40) and then claims she "doesn't recall" what caused the seizure (8 RR 41). Maria testified that this incident showed, once more, that Ryan needed to leave and that she did not want him around the baby. (8 RR 42).

She asked Ryan to leave after the overdose, which was enough to sober him up for a couple of days, before he was getting back to "drugged out, zoned out, messed up." (8 RR 43). Knowing that having Ryan out of her life would create a financial hardship, she and Ryan entered an agreement pursuant to which Ryan would pay child support. (8 RR 44-45). Before entering into this agreement, Ryan told Maria that leaving the house and losing both her and Jeffery would cause an emotional collapse. (8 RR 45). Ryan signed the agreement. The agreement and pieces of Maria's diary were in Ryan's wallet when he died. (8 RR 46). Maria testifies that she "does not recall" if Jesus told

25

her that he shot Ryan because Ryan came at him with a knife. (8 RR 51). She then testified that Ryan would get aggressive with people "almost at the drop of the hat." (8 RR 51). She felt that Ryan was choosing drugs over her, Jeffrey, and living a moral life. ( 8 RR 52).

Jesus Rivera is the defendant in this case. He testified that he did indeed shoot Ryan, but that he only did so to defend himself, and had no pre-existing desire to kill Ryan. (9 RR 134). Jesus testified when he purchased the shotgun, he did so intending to share it with Ryan. At the time of the shooting, Jesus had been sleeping on the living room couch, and was doing so at the request of his sister. (9 RR 137). While Jesus was waiting for his father to pick him up to go get the gun, Jesus and Ryan were visiting on the back patio. (9 RR 141). Ryan took both Xanax and Klimax at this time. (9 RR 141). Jesus loved Ryan, and he had no ill feelings towards Ryan. The day had started just like any regular work day. (9 RR 138). He was in a good mood; he got paid that day, a good paycheck, and received a turkey from his employer. (9 RR 138-9). In fact, when he arrived home that afternoon around 4:00 or 5:00 pm, from work, Jesus gave Ryan a hug and a handshake. (9 RR 141). Jesus was out of drugs so Ryan shared some Klimax in a blunt.

26

(9 RR 145). A blunt is a cigarillo, hollowed out and filled with Klimax. (9 RR 145). He and his Dad went to buy a gun at Academy. Jesus had never shot a shotgun, hand gun, or a pistol in his life before that evening. (9 RR 162). He wanted to show the gun to Ryan. He saw Ryan was messed up on drugs and Jesus did not think it was wise to let Ryan handle the gun. (9 RR 173). Ryan made a comment to Frijol, and Ryan seemed agitated. (9 RR 177). Ryan wanted to see the gun and Jesus told him no. (9 RR 180). Jesus went to sleep and woke up during the night and watched T.V. (9 RR 183-85). He saw Ryan come out of the master bedroom. Ryan seemed agitated and aggressive, and still messed up on Xanax and beer. (9 RR 185). Ryan was asking for his Klimax. "Where's my Klimax?" (9 RR 188). Ryan smoked some in his pipe, and was different in how he "hit the bowl." Ryan was inhaling aggressively and strongly. (9 RR 190).

Jesus then went to sleep on the couch. He woke up to a voice, and he looked at the direction of the loveseat/couch. He saw Ryan's face staring directly into his face. Ryan's right hand was clenching the knife and his left hand was also clenched. (10 RR 37). He was frightened and moved away, grabbed his shotgun under the couch, and stood up.

27

Ryan kept moving towards him and Jesus chambered a shot. The chambering had no effect on Ryan, who kept moving towards him, and made a movement with the knife towards the left side of Jesus' neck or face. (10 RR 48). Jesus threw back his head, swung around and threw up the gun and shot. (10 RR 49). Jesus could not comprehend what had just happened. (10 RR 55). It was Maria's idea to move the body. Jesus needed help so he called Frijol. (10 RR 70).

C. Application of Law to the Facts

The objective facts, evidence and testimony elicited from the State and Defense raised the issue of self-defense against Appellant's friend Ryan, a paranoid, aggressive, drug addict. According to the overwhelming weight of the testimony, everyone present at the scene was in fear of the decedent, Ryan Yearley at some point in the past, continuing to the present.

One may use force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31. This includes using deadly force against the other if "the actor would be justified in using force against the other

28

under Section 9.31," and "when and to the degree the actor reasonably believes the deadly force is immediately necessary" "to protect the actor [or another] against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE § 9.32(a). The right of self-defense is at least as fundamental to freedom and liberty as free speech, the right to vote, and trial by jury. *Ferrel v. State*, 16 S.W.3d 861, 865 (Tex.App.-Houston [14th Dist] 2000), rev'd on other grounds, 55 S.W.3d 586 (Tex.Crim.App. 2001).

When a justification theory of defense is raised:

[a] defendant has the burden of producing some evidence to support a claim of self-defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt. When a fact finder determines that the defendant is guilty, there is an implicit finding against the defensive theory.

*Miller v. State*, 177S.W.3d 177, 183 (Tex.App.-Houston [1st Dist] 2005, pet ref'd), *citing Zuliani v. State*, 97 S.W.3d 589, 594 (Tex.Crim.App.

29

2003). It is well-settled that when the legal sufficiency of the evidence supporting a fact finder rejection of a defense such as self-defense in a murder case is challenged by a defendant,

"we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt."
*Id.,* quoting, *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App. 1991).

Under Texas law of self-defense, a defendant's conduct is excused if he formed a reasonable belief that deadly force was immediately necessary to protect himself or a third party from another use or attempted use of unlawful deadly force. See TEX. PENAL CODE, § 9.32. The reasonableness of the belief is measured by the objective standard of an "ordinary and prudent man." See, TEX. PENAL CODE § 1.07(42); see also *Davis v. State*, 104.W.3d 177, 181 (Tex.App.-Waco 2003, no pet.)("Although the jury employs an objective standard to determine the reasonableness of the defendant's belief, it must view the facts from the defendant's perspective."). Thus, under the instruction correctly charging the law Jesus Rivera was entitled to acquittal if a person in his position reasonably believed the deadly force was

30

immediately necessary to protect himself or another against the Ryan's use or attempted use of unlawful deadly force. TEX. PENAL CODE § 9.32, 9.33.

"Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. TEX. PENAL CODE § 9.01(3).[8] "Reasonable belief means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor. TEX. PENAL CODE § 1.07(a)(42).

In a related defensive issue, the United States Supreme Court in *Davis v. United States*, 160 U.S. 469 (1895), held:

"We are unable to assent to the doctrine that, in a prosecution for murder, the defense being insanity and the fact of the killing with a deadly weapon being clearly established, it is the duty of the jury to convict where the evidence is equally balanced on the issue as to the sanity of the accused at the time of the killing. On the contrary, he is entitled to an acquittal of the specific crime charged, if upon all the evidence, there is a reasonable doubt whether he was capable in law of committing crime." *Id.,* at 484.

"The greater weight and preponderance of the credible evidence herein shows that [Rivera] acted in self-defense from the apparent danger created by the attack of Ryan Yearley, so that it is manifestly unjust" that he was convicted of manslaughter. The unfortunate death of Ryan arose from an attack upon Jesus Rivera by his dear friend, his brother by friendship, due to the assailant's apparent threat of stabbing Rivera, not from any act that the law justified Rivera in using to protect himself. The jury's verdict to the contrary is, therefore, against the great weight of the evidence. Jesus Rivera was entitled to a verdict of not guilty as his acts were clearly in the defense of himself. Consequently, the jury's rejection of Appellant's justification of self-defense and the jury's subsequent verdict was not rational. Accordingly, this Court should, as it must, enter an order reversing the judgment entered in the court below and thereafter enter a judgment of acquittal.

## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, the Appellant, prays the Court of Appeals uphold these points of error, reverse the judgment and render an acquittal, or remand this case for a new trial, or in the

alternative reform the judgments to reflect one conviction for murder, or for such other relief as justice may require.

Respectfully submitted,

/S/_____
**ANGELA MOORE**
SBOT # 14320110
310 S. St. Mary's Suite 1830
San Antonio, Texas 78205
210-364-0013
amoorelaw2014@gmail.com

**Certificate of Compliance**

Pursuant to Rule 9.4(i)(2)(B) this brief is a direct appeal to the Court of Appeals in a case in which the death penalty has been assessed and the word count does not exceed 15,000 words.

On this 14th day of December, 2015.

___/s/_____
ANGELA MOORE
SBOT # 14320110
310 S. St. Mary's Suite 1830
San Antonio, Texas 78205

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Brief For Appellant has been delivered via electronic service to the Bexar County District Attorney's Office and to Appellant via U.S. mail.


___/s/_____
ANGELA MOORE